**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**JOSHUA M.,**

       **Petitioner,**

**v.**　　　　　　　　　　　　　　　　　　　　　　　**Civil Action No. 3:19cv770**

**WILLIAM BARR,** *in his official capacity
as the Attorney General of the United States;*
**CHAD WOLF,** *in his official capacity
as Acting Secretary for the United States
Department of Homeland Security;*
**KENNETH CUCCINELLI,** *in his capacity as
Purported Acting Director for United States
Citizenship and Immigration Services,*

       **Respondents.**

<u>**MEMORANDUM OPINION**</u>

       Petitioner Joshua M., a native of Honduras to whom the United States has granted Special Immigrant Juvenile status, has filed a 28 U.S.C. § 2241 habeas petition challenging his removal order and pending deportation. His petition implicates the cross-section between the Executive, Legislative, and Judicial branches, and raises questions regarding how the judicial branch may proceed when the executive branch has detained and ordered removed a person that has received a special legal status in accordance with statutes that the legislative branch enacted. Ultimately, Joshua's success in prevailing against this motion to dismiss turns on his singular (and rarely evaluated by courts) immigration status: he is a Special Immigrant Juvenile. To explain this Court's resolution, this memorandum opinion considers various statutory frameworks set forth in the Immigration and Nationality Act together with complex questions of constitutional law.

After holding a hearing, the Court now addresses Petitioner's Motion for a Temporary

Restraining Order, (ECF No. 5), § 2241 Habeas Petition,[1] ("§ 2241 Pet.," ECF No. 1), and

Respondent William Barr, Kevin McAleenan,[2] and Kenneth Cuccinelli's ("Respondents")

Motion to Dismiss for lack of jurisdiction, (ECF No. 20).  Respondents filed a response in

---

[1] Section 2241 provides in relevant part:

(c) The writ of habeas corpus shall not extend to a prisoner unless--
(1) He [or she] is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or
(2) He [or she] is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or
(3) He [or she] is in custody in violation of the Constitution or laws or treaties of the United States; or
(4) He [or she], being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or
(5) It is necessary to bring him [or her] into court to testify or for trial.
(d) Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him [or her] and each of such district courts shall have concurrent jurisdiction to entertain the application.  The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

28 U.S.C. § 2241.

[2] On November 13, 2019, Chad Wolf replaced Kevin McAleenan as the Acting Secretary for the United States Department of Homeland Security ("DHS").  In accordance with Federal Rule of Civil Procedure 25(d), the Court will direct the Clerk to substitute Chad Wolf for former Secretary McAleenan as the Respondent for DHS in this matter.

Case 3:19-cv-00770-MHL   Document 47   Filed 02/20/20   Page 3 of 72 PageID# 902

opposition to the Motion for a Temporary Restraining Order.  (Resp., ECF No. 22.)  Joshua filed

a response in opposition to the Motion to Dismiss, ("Opp'n," ECF No. 25), and a reply to

Respondents' response, (ECF No. 26).  Respondents replied.  (ECF No. 27.)  With leave from

the Court, Amicus Curiae filed a brief[3] ("Amicus Br.," ECF No. 33), to which Respondents filed

a response, (ECF No. 41), and Amici replied, (ECF No. 45).  For the reasons articulated below,

the Court finds that it has jurisdiction and will deny the Motion to Dismiss.

## I.  Factual Background

To understand the legal issues raised in Joshua's § 2241 Petition, the Court reviews

Joshua's childhood in Honduras, his arrival in the United States, the state court orders he

acquired in New York to support his Special Immigrant Juvenile ("SIJ") status, and the

underlying immigration proceedings leading to his order of removal.

### A.    Joshua's Parents Abandon Him in Honduras At Age Two; He Then Experiences Gang Threats and Attacks Even After Moving to Escape Them

For purposes of this Motion, Respondents do not dispute Joshua's familial history or the

factual allegations in his § 2241 Petition.  (Dec. 10, 2019 Transcript ("Tr.") 52–53, ECF No. 39.)

In this Motion to Dismiss, the Court assumes the truth of the facts alleged by Joshua.  *Kerns v.*

*United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Joshua was born in Honduras in May 1998.  When he was two years old, Joshua's mother

left him to come to the United States.  (§ 2241 Pet. Ex. 5 "Joshua Affidavit" 7, ECF No. 1–5.)

Before his mother left, Joshua's father had also abandoned him to come to the United States.

---

[3] Eight organizations comprise the Amicus Curiae:  The Immigrant Justice Corps, Kids in Need of Defense, The Lawyers' Committee for Civil Rights of the San Francisco Bay Area, The New Jersey Consortium for Immigrant Children, The Northwest Immigrant Rights Project, The Political Asylum/Immigration Representation Project, Public Counsel, and The Young Center for Immigrant Children's Rights.  (ECF No. 31.)

(*Id.*)  After being deserted by his parents as a toddler, Joshua lived with his maternal aunt in San Pedro Sula, Cortes, Honduras.  (*Id.*)

When Joshua became a teenager, a Honduran gang started to threaten him and his aunt. (*Id.*)  The gang told Joshua that he "had to join the gang because [he] lived in their neighborhood and because [his] aunt did not pay the rent."  (*Id.*)  The gang threatened to kill Joshua if he did not join them.  (*Id.*)  The gang members started to physically harm Joshua.  (*Id.* 8.)  "On one occasion, a gang member cut [Joshua] with a knife on [his] left arm."  (*Id.* 8.)  Joshua still bears a scar from this attack.  (*Id.*)

Joshua continued to experience substantial violence and trauma at the hands of the gang. In 2011, when Joshua was approximately thirteen years old, gang members surrounded Joshua and his friends and started throwing firecrackers at them.  (*Id.*)  A firecracker landed in Joshua's right ear, causing him partial hearing loss.  (*Id.*)

In 2012, gang members killed one of Joshua's friends, Dirke Garcia.  (*Id.*)  The gang wanted Dirke to join their ranks, but he refused.  (*Id.*)  Dirke was found dead in the river, apparently "beaten to death."  (*Id.*)

In 2013, roughly around age fifteen, Joshua learned that his aunt's husband was physically abusing her.  (*Id.*)  Eventually, his aunt left her abusive spouse and she and Joshua moved to Trujillo, Hondruas.  (*Id.*)  After moving to Trujillo, the gang continued to threaten Joshua and shot at the house where he and his aunt lived.  (*Id.* 9.)  Joshua claims that the gang is still looking for him and that his family in Honduras continues to receive threats.  (*Id.*)

### B.    Joshua Enters the United States as an Unaccompanied Minor

In May 2014, Joshua left Honduras and entered the United States as an "Unaccompanied Alien Child."  (§ 2241 Pet. Ex. 4 "I-589 Application" 2, ECF No. 1–4; § 2241 Pet., Ex. 7

"Motion to Reopen" 2, ECF No. 1–7.)  Immigration officials released him to family members in

New York.  (Mot. Reopen 2.)  Despite his efforts, Joshua did not reunite with his parents because

of their substance abuse and physical abuse, but he ultimately found a home with an uncle

("Credy") and lived with him in the Bronx.  (*Id*. 2–3.)

### C.     New York Family Court Appoints a Legal Guardian for Joshua and Makes a Special Finding that it is not in Joshua's Best Interest to be Removed from the United States

In August 2017, Joshua, at age nineteen, filed a petition for guardianship and a motion for

special findings with the Bronx County Family Court in New York ("New York Family Court").

(Mot. Reopen 3, ECF No. 1–7; J. Stip. R., ECF No. 40–2.)  On January 23, 2019, the New York

Family Court issued an order finding that Joshua could not reunite with his parents because his

father abused him "by routinely becoming intoxicated and hitting Joshua and throwing

household objects at him," neglected "him by regularly abusing alcohol in Joshua's presence,"

and abandoned him "by failing to provide for him financially or emotionally his entire life and

by kicking Joshua out of his home."  (*Id.* 13.)  The New York Family Court similarly found that

Joshua's mother abandoned him "by failing to provide for him financially or emotionally his

entire life and by choosing to live in a home with her abusive husband where Joshua is not

welcome," and neglected him by "allowing him to be exposed to violent physical abuse against

her and Joshua's half-siblings by her husband, Candido Martinez Gomez."  (*Id.*)  As a result, the

New York Family Court held that:

> It is not in Joshua's best interest to be removed from the United States and
> returned to Honduras, his country of nationality, because he does not have an
> adequate and secure home in Honduras that would guarantee his safety, happiness
> and hopes for the future.  Gang members have sworn to kill Joshua should he
> return.  Both his father and his mother are incapable of caring for him and he
> would be at risk of further abuse, abandonment, and neglect at his parents' hands.

(*Id.* 14.)  That same day, the New York Family Court appointed Credy, Joshua's uncle, as his

legal guardian.  (*Id.* 15.)  The New York Family Court ordered that the appointment "shall last until [Joshua's] 21ˢᵗ birthday, since the subject is over 18 and has consented to the appointment until he/she reaches the age of 21."  (*Id.*)

On February 12, 2019, three weeks after receiving the New York Family Court order, Joshua, then twenty-years-old, applied for Special Immigrant Juvenile ("SIJ") status by filing an I-360 Petition.[4]  (Mot. Reopen 3.)  In 2018, however, the United States Citizenship and Immigration Services ("USCIS") adopted a new policy in which the agency refused to recognize the eligibility for SIJ status of juvenile immigrants between the ages of eighteen and twenty-one.  *See R.F.M. v. Nielsen*, 365 F. Supp. 3d 350 (S.D.N.Y. 2019).  As a result, USCIS was not approving petitions, like Joshua's petition, from eligible SIJ applicants who were over the age of eighteen but under twenty-one.

> ### D.     Pursuant to *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350 (S.D. N.Y. 2019), a Class Action Lawsuit in Federal Court, Joshua Receives Special Immigrant Juvenile Status

In 2018, young immigrants filed a class action lawsuit in the United States District Court for the Southern District of New York challenging USCIS's new policy regarding the eligibility of SIJ applicants between ages eighteen and twenty-one as arbitrary and capricious.  On March 15, 2019, one month after Joshua filed his I-360 Petition, the Southern District of New York agreed with the plaintiffs and found that

> [i]t is plain that the [Department of Homeland Security and USCIS], contrary to
> their prior practice, and in contravention of federal law, are now following a
> policy whereby the New York Family Court cannot issue the necessary findings
> to juvenile immigrants between the ages of eighteen and twenty-one to enable
> them to obtain SIJ status. That effectively precludes those immigrants in New

---

[4] Joshua and his attorney signed the I-360 application on January 23, 2019, the same day the New York Family Court issued its orders regarding Joshua's inability to reunify with his parents. (§ 2241 Pet. Ex. 2 16–18, ECF No. 1-2.)  The record shows that USCIS marked the application received on February 12, 2019.  (*Id.* 1.)

> York State from obtaining SIJ status despite the fact that the immigration statute
> otherwise provides that relief. If the immigration laws are to be changed in that
> way, the change must come from Congress and not from the immigration
> authorities. Therefore, the plaintiffs' motion for summary judgment should be
> granted, and the plaintiffs' motion for class certification should also be granted
> and they should be allowed to proceed anonymously.

*R.F.M.*, 365 F. Supp. 3d at 360.

In reaching that conclusion, the *RFM* court rebuffed the Government's arguments that the court lacked jurisdiction because plaintiff sought to challenge an agency policy, rather than individual claims concerning SIJ status. *Id.* at 373. Similarly, the *RFM* court noted that "courts have jurisdiction to review a predicate legal question that amounts to a nondiscretionary determination underlying the denial of relief." *Id.* (quotations marks and citations omitted).

Turning to the merits of petitioners' claims, the *RFM* court summarized that the new policy denying SIJ status to applicants between ages eighteen and twenty-one contravened "the plain language of the SIJ statute, lack[ed] a reasoned explanation, [was] premised on erroneous interpretations of state law, and was not enacted with adequate notice, [making] the policy arbitrary and capricious, in excess of statutory jurisdiction, and without observance of procedure required by law." *Id.* at 383 (quotations marks and citations omitted). Because USCIS's actions violated the Administrative Procedure Act, the *RFM* court set aside the unlawful USCIS policy that arbitrarily denied SIJ applications like Joshua's. *Id.*

In February 2019, one month before the *RFM* decision, Joshua was driving from New York to New Orleans. On the way, he was pulled over for speeding near Fredericksburg, Virginia. He was then charged with reckless driving, in violation of Virginia Code § 46.2-862, and driving without a valid license, in violation of Virginia Code § 46.2-300.[5] (J. Stip. R., ECF

---

[5] Violations of Virginia Code § 46.2-300 and § 46.2-862 constitute misdemeanor offenses. Va. Code Ann. § 46.2-300 ("A violation of this section is a Class 2 misdemeanor. A

No. 40-2 at 2.)  A Virginia state court sentenced Joshua to 13 days incarceration (time served), a

$113 fine, a 113-day suspension of his license for reckless driving, and a $25 fine for driving

without a valid license.  (*Id*. 2–3.)  In the year since his arrest for reckless driving and driving

without a license, two misdemeanor offenses, Joshua has been detained in Farmville, Virginia.

     Notably, Joshua has no other criminal history apart from these two misdemeanors.[6]

(*Id.* 3).  Joshua's detention in Farmville led to the § 2241 Petition before this Court.

---

second or subsequent violation of this section is a Class 1 misdemeanor."); *United States v. Hudson*, 497 F. Supp. 2d 771, 773 n.2 (W.D. Va. 2007), *aff'd*, 375 F. App'x 353 (4th Cir. 2010) ("Under Virginia law, regardless of the posted speed limit, driving in excess of eighty miles per hour is considered reckless driving, a Class One misdemeanor.").  Although Joshua is now in executive detention, and not state custody, the Court observes that his executive detention has likely exceeded any permissible prison term for these state offenses.  *See* Va. Code § 18.2-11 (class one misdemeanors are punishable by confinement "for not more than twelve months" and class two misdemeanors are punishable by confinement "for not more than six months").

    [6] Respondents have noted only that Joshua "is under investigation by the New York City Police Department ("NYPD") as a result of a November 2018 sexual assault allegation."  (Mem. Supp. Mot. Dismiss, Ex. A., Trump Decl. ¶ 13.)  Respondents also aver that Joshua "is also under investigation" for threatening an NYPD officer.  (*Id.* ¶ 14.)

    During a December 10, 2019 status conference, the Court asked for "the government's position about what constitutes Joshua's criminal history."  (Tr. 18.)  Respondents explained that "there was an allegation in the petition that referenced the criminal history, and therefore [Respondents] put it in the brief as a matter of information."  (*Id*.)  When the Court stated, "I just want to be clear because there is no criminal history because there's no charge," (*id.* 19), Respondents answered, "[that]'s correct, Your Honor," (*id.*)

    Of course, in the criminal context United States law recognizes that individuals are innocent until proven guilty.  *See also Aguilera-Enriquez v. Immigration & Naturalization Serv.*, 516 F.2d 565, 570 (6th Cir. 1975) ("The Immigration authorities must look to judicial records to determine whether a person has been 'convicted' of a crime.  They may not determine on their own an alien's guilt or innocence.")  Most commonly, felonies, not misdemeanors, constitute removable offenses.  *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 185 (2007) ("The Immigration and Nationality Act, 66 Stat. 163, as amended, 8 U.S.C. § 1101 et seq., lists a set of offenses, conviction for any one of which subjects certain aliens to removal from the United States, § 1227(a).").

**E.     After Being Detained for Minor Traffic Offenses, an Immigration Judge
Orders Joshua Removed Because He Illegally Entered the United States**

On June 13, 2019, after being detained for misdemeanor traffic offenses, and with his SIJ
application pending, Joshua filed an application for Asylum, Withholding of Removal and
Protection under the Convention Against Torture.  (I-589 Application 2.)  On July 31, 2019,
Immigration Judge Raphael Choi denied Joshua's application for asylum.  (Mot. Reopen 57.)
On August 14, 2019, two months later, Judge Choi entered a one-page removal order showing
that Joshua had waived his right to appeal.  (*Id*.)  As a result, Joshua was scheduled to be
deported in September 2019.  (*Id.* 2.)

During this time, the Southern District of New York certified the *RFM* class and, in May
2019, sent notice to the class (the "Notice of Class Membership"), which included Joshua,
advising class members that the "Court [had] found the Government violated the law for ALL
people who have claims like the Plaintiffs."  (§ 2241 Pet. Ex. 3 "Notice to RFM Class" 1, ECF
No. 1–3.)  Although the Notice of Class Membership went to Joshua's residence in the Bronx,
Joshua did not receive the Notice until August 27, 2019, because he was detained in Farmville.
(§ 2241 Pet. 20.)  Inexplicably, his legal counsel from the Safe Passage Project never received
the Notice of Class Membership despite having entered an appearance for his I-360 Petition.
(§ 2241 Pet. 20 n.6.)

After receiving the Notice regarding the *RFM* class, Counsel for Joshua filed an
expedited request on September 12, 2019, for adjudication of his I-360 Petition to allow Joshua
to obtain SIJ status which USCIS's prior unlawful policy had delayed.  (Mot. Reopen 3.)
Meanwhile, Immigration and Customs Enforcement ("ICE") officials informed Counsel for
Joshua that he was scheduled to be "removed on Thursday, September 19, 2019."  (*Id.* 2.)  On
September 16, 2019, three days before his initial removal date, Counsel for Joshua filed a motion

to "reopen his case and vacate the removal order that became final on July 31, 2019." (*Id.* 1.)
The ICE Office of Chief Counsel "agreed to join [Joshua's] motion to stay removal, but declined
to join the . . . motion to reopen." (*Id.*)  In the motion to reopen, Counsel for Joshua averred that
the Immigration Court "was not aware of the fact that Joshua had a pending petition for [SIJ]
Status, nor that he was a class member of *R.F.M. v. Nielsen*." (*Id.* 5.)  Counsel for Joshua further
explained that "[a]djudication of Joshua's SIJ[] petition will not automatically cancel a removal
order entered by an Immigration Judge; the order must be reopened by the Immigration Court."
(*Id.*) (citation omitted).

On September 18, 2019, USCIS approved Joshua's I-360 Petition after the *RFM* court set
aside USCIS's unlawful policy denying applicants between ages eighteen and twenty-one such
status in contravention of the SIJ statutes.  (§ 2241 Pet. Ex. 6, ECF No. 1–6; § 2241 Pet. Ex. 9
"Motion to Reopen Supplement" 14, 16, ECF No. 1–9.)  On September 20, 2019, Counsel for
Joshua supplemented the motion to reopen with "new evidence that was not available or
obtainable at the time of filing," his SIJ classification.  (Mot. Reopen Supp. 2.)  In that
supplement, Counsel for Joshua explained that the Immigration Court "ordered Joshua removed
on July 31, 2019.  At the time, Joshua's I-360 Petition was still pending." (*Id.*)  Counsel then
explained that Joshua's I-360 Petition had been granted and asked the Immigration Judge to
consider Joshua's SIJ status.  (*Id.*)

In a one-page order entered on October 7, 2019, Judge Choi denied Joshua's motion to
reopen.  (*Id.* 21.)  The one-page order stated only that the Immigration Judge agreed with the
reasons stated in the opposition to the motion, and explained that

> [a]lthough timely filed, the motion is based on relief that is not immediately
> available.  Specifically, the approved I-360 priority date is February 12, 2019,

which is well beyond the current priority date of July 1, 2016.  Thus, with no relief immediately available, and with alien in detention, the motion is denied.

(*Id.* (citations omitted).)

Joshua appealed the denial of his motion to reopen.  (*Id.* 27.)  In the appeal, Joshua asserted that the Immigration Judge

> committed legal error by failing to consider [Joshua's] SIJ Status.  [Joshua] was only ever charged with removability under [the Immigration and Nationality Act] § 212(a)(6)(A)(i), as an alien present without admission or parole.  Upon the approval of [Joshua's] I-360 Petition, [Joshua] became a Special Immigrant Juvenile, and per INA § 245(h)(1), a Special Immigrant Juvenile "*shall* be deemed . . . to have been paroled into the United States for the purposes of adjustment."

(*Id.*)  Joshua further asserted that "USCIS's illegal policy of denying or delaying adjudication of I-360 Petitions like [Joshua's] may have had an adverse effect on [Joshua], because he could not have presented evidence of his I-360 Approval at his Individual Hearing on July 31, 2019."  (*Id.*)  Joshua claimed that the Immigration Judge erred when he did not consider his *RFM* class membership, and the Immigration Judge "did not substantively respond to any of [Joshua's] legal arguments in his 3-line handwritten decision."  (*Id.*)  Joshua remained in detention and subject to an order of removal while his appeal pended before the Board of Immigration Appeals ("BIA").  Facing immediate removal while his appeal progressed in the BIA, and without the ability to appeal any decision to the court of appeals, Joshua sought relief in federal district court.  The Court turns now to the procedural history of the instant § 2241 Petition.

## II.  Procedural History

### A.  Joshua's Claims for Relief in the § 2241 Petition and Request for a Preliminary Injunction Resulted in this Court Granting a Temporary Administrative Stay

On October 20, 2019, Joshua filed in the Southern District of New York a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 and an emergency motion for a temporary

restraining order and preliminary injunction.  The next day, the Southern District of New York

transferred Joshua's case to this Court because he is detained in Farmville, Virginia, which is

located in the Eastern District of Virginia.  (ECF No. 7.)  On October 23, 2019, following a brief

review of the issues raised in Joshua's pleadings, the Court concluded that the § 2241 Petition

raised "facially valid claims that warrant service."  (Oct. 23, 2019 Order 2, ECF No. 10.)  The

Court directed Joshua to serve the Respondents:  (1) William Barr, in his official capacity as the

Attorney General of the United States; (2) Kevin McAleenan, in his official capacity as

then-Acting Secretary for the United States Department of Homeland Security; and (3) Kenneth

Cuccinelli, in his capacity as Acting Director for United States Citizenship and Immigration

Services.  (*Id.*)

The Court also granted in part the emergency motion for a restraining order and ordered

"a temporary 60-day administrative stay of [Joshua's] removal to preserve the *status quo*

pending further briefing before this Court."[7]  (*Id.* 3.)  The Court ordered further briefing and

scheduled a status conference for December 10, 2019.  (*Id.* 4–5)

In the § 2241 Petition, Joshua sought relief "pursuant to 28 U.S.C. § 2241; the All Writs

Act, 28 U.S.C. § 1651; the Immigration and Nationality Act ('INA') and regulations thereunder;

the Administrative Procedure Act ('APA'), 5 U.S.C. § 701, and Article I, Section 9, Clause 2, of

the United States Constitution ('Suspension Clause') and the Fifth Amendment of the United

States Constitution."  (§ 2241 Pet. 1.)  Joshua claimed jurisdiction under the same legal

provisions along with federal question jurisdiction, 28 U.S.C. § 1331, and the Declaratory

---

[7]  Ordinarily, a temporary restraining order ("TRO") lasts only fourteen days.  *See* Fed.
R. Civ. P. 65(b)(2).  Here, before ordering additional briefing, the Court stayed Joshua's removal
within three days of the TRO being filed in the Southern District of New York.  The Court then
extended the stay for 60 days before holding a hearing to discuss the complex issues raised here.
The Court commends the Parties for their sensible and amicable approach to the Court's briefing
and hearing schedule so that these complex issues could be properly addressed.

Judgment Act, 28 U.S.C. § 2201.  (*Id.* 9.)  Joshua brought four claims for relief:

> (1) his removal prior to the adjudication of his SIJ petition violates procedural due process under the United States Constitution ("Procedural Due Process Claim");
> (2) his removal violates the Administrative Procedure Act ("APA Claim");
> (3) his removal must be stayed to protect his rights under the Immigration and Nationality Act and the Administrative Procedure Act ("Stay of Removal Claim"); and,
> (4) his removal violates the Suspension Clause of the United States Constitution ("Suspension Clause Claim").

(§ 2241 Pet. 23–28.)

In his Procedural Due Process Claim, Joshua contends that he "has a vested liberty interest in preventing his removal" because he has received SIJ status.  (*Id.* 23.)  Because, in accordance with the plain language of the SIJ statute, "physical presence in the United States is a condition of SIJ Status, [Joshua's] SIJ Status is nullified once he is removed."  (*Id.*)  Joshua avers that his removal would "trigger additional immigration violations that would make it impossible" to maintain his SIJ designation and pursue adjustment of status.  (*Id.*)  Joshua contends "the threats faced if removed" would further inhibit his ability to preserve his SIJ status.  (*Id.*)

In his APA Claim, Joshua asserts that his pending removal violates "the APA and causes prejudice . . . per 8 C.F.R. § 215.3(h) for four key reasons."  (*Id.* 24.)  Those reasons include:  (1) rendering him statutorily ineligible for SIJ status; (2) depriving him of due process; (3) losing the ability to pursue the adjustment of his immigration status; and, (4) improperly altering the substantive rules concerning SIJ status without the APA required notice-and-comment period.  (*Id.* 24–26.)  Because his deportation "would render him statutorily ineligible for SIJ Status**,"** and such action "is not in accordance with the law and is an abuse of discretion," Joshua claims Respondents' actions violate the APA.  (*Id.* 24.)

In his Stay of Removal Claim, Joshua argues that the Court should stay his removal to protect his statutory rights under the INA and the APA.  (*Id.* 27.)  Because Joshua "faces the

pros[p]ect of being killed by gang members who have threatened his life," he believes that he

will be unable to adjudicate his motion to reopen from Honduras.  (*Id.*).

Lastly, in his Suspension Clause Claim, Joshua argues that if 8 U.S.C. § 1252 "did strip

jurisdiction from this case, that statute would be unconstitutional as applied" to Joshua.  (*Id.* 10.)

Specifically, § 1252(g) would violate the Suspension Clause because it would deny Joshua "any

opportunity for meaningful judicial review of the unlawfulness of [his] removal."  (*Id.* 28.)

As relief, Joshua asks that the Court do eight things:

> (1) assume jurisdiction over his case;
> (2) enjoin Respondents from removing him from the United States pending the resolution of this action;
> (3) declare that the process *as applied* to Joshua violates the Due Process Clause of the Fifth Amendment, the INA, the APA, and federal regulations;
> (4) issue a writ of habeas corpus directing Respondents to pursue a conditionally adequate process to justify adverse immigration actions against Joshua;
> (5) stay Joshua's removal from the United States until he exhausts that process;
> (6) enter an order staying his removal until fourteen days after the BIA renders its decision on Joshua's motion to reopen;
> (7) award him costs and attorneys' fees; and,
> (8) "grant such further relief as the Court deems just and proper."

(*Id.* 29.)

## B.  Respondents' Arguments in Support of their Motion to Dismiss for Lack of Jurisdiction

In response to the § 2241 Petition, Respondents filed a motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(1),[8] (the "Motion to Dismiss"), requesting that the Court

enter an order dismissing the case for lack of jurisdiction.  (Mot. Dismiss, ECF No. 20.)

Respondents argue that "under 8 U.S.C. § 1252(g), this Court lacks jurisdiction over the

Petition."  (Mem. Supp. Mot. Dismiss 1, ECF No. 21.)  In support of their Motion to Dismiss,

---

[8] Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move to dismiss a plaintiff's complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).

Respondents point to *Mapoy v. Carroll*, 185 F.3d 224 (4th Cir. 1999), to support their argument that Joshua cannot overcome § 1252(g)'s jurisdictional bar.  (*Id.* 7–8.)

Importantly, because Respondents rest their argument on this statute, they do not challenge the facts alleged in Joshua's § 2241 Petition.  (*Id.* 2–5.)  Rather, Respondents claim that on its face the § 2241 Petition fails to show subject matter jurisdiction.

Respondents further assert that the Suspension Clause does not save Joshua's petition from this jurisdictional bar for two reasons.  First, although Respondents do not contest that Joshua, as a beneficiary of SIJ status, may invoke the Suspension Clause, Respondents contend that the "Suspension Clause does not apply here because [Joshua] is not seeking release from custody and thus is not actually requesting habeas relief."  (*Id.* 2)

Second, Respondents argue that Joshua has an adequate alternative remedy to habeas because he may pursue his motion to reopen and the related BIA appeal even after removal to Honduras.  (*Id.* 14.)  Respondents explain that "[t]he applicable court of appeals also has jurisdiction to review final orders of removal, but the deadline for [Joshua's] filing a petition for review of his July 31, 2019 removal order has passed."  (*Id.* 17 n.13.)  Because another avenue exists for judicial review, Respondents state that Joshua's § 2241 Petition for a writ of habeas corpus does not trigger the Suspension Clause.

Regarding Joshua's SIJ status, Respondents reframe the issue to posit that "for purposes of § 1252(g)'s jurisdictional bar and the Suspension clause, [the question] is not whether Petitioner has a liberty interest in or will lose any benefits of his SIJ classification.  The question is instead whether the motion to reopen administrative review process followed by court of appeals review is an adequate and effective substitute for habeas."  (*Id.* 18.)  Respondents also argue that Joshua's SIJ classification will not be "revoked without notice and an opportunity to

be heard" and that, should he win his administrative appeal from abroad, "USCIS will treat

[Joshua] as though he had not been removed." (*Id.* 20 (quotations omitted).)  Respondents cite a

Frequently Asked Questions (FAQs) website, https://www.ice.gov/faq/facilitating-return,[9] for the

proposition that Joshua could revive his SIJ status should this happen.  (*Id.*)

Lastly, Respondents assert that the "special circumstances" exception, also known as the

"home country danger" exception, to the general rule that the administrative process and court of

appeals review provide an effective substitute for habeas inapplicable because Joshua does not

"claim to face country-wide threats or persecution that would prohibit him from pursuing his

administrative process and petition for review from Honduras." (*Id.* 22–23.)  In sum, "[b]ecause

the Court lacks jurisdiction under § 1252(g) and because [Joshua] has an adequate and effective

substitute for habeas," Respondents argue that the Court should dismiss the Petition for lack of

jurisdiction.  (*Id.* 2.)

C.      **Amici Assert that Removing SIJ Beneficiaries Awaiting Visas Will Have an
        Extraordinary Impact and Contravene the Purpose of the SIJ Statutes**

On December 6, 2019, four days before the hearing to discuss the status of Joshua's

removal proceedings and BIA appeal, the Immigrant Justice Corps, Kids in Need of Defense, the

Lawyers' Committee for Civil Rights of the San Francisco Bay Area, the New Jersey

Consortium for Immigrant Children, the Northwest Immigrant Rights Project, the Political

Asylum/Immigration Representation Project, Public Counsel, and the Young Center for

Immigrant Children's Rights (collectively, "Amici"), filed an amicus brief addressing the policy

implications of Joshua's § 2241 Petition and Respondents' position in this case.  (Amicus Br.,

---

[9] Respondents specifically cited "U.S. Immigration and Customs Enforcement,
Frequently Asked Questions (FAQs) on Facilitating Return for Lawfully Removed Aliens, *If ICE
facilitates my return to the United States after my petition for review has been granted, what will
my immigration status be, if any?*, available at https://www.ice.gov/faq/facilitating-return." (*Id.*)

ECF No. 33.)  In their brief, Amici highlight the inherent friction created by the executive branch taking steps to remove individuals to whom the legislative branch has afforded statutory protections.  (Amicus Br. 13–15.)  For instance, Amici assert that Respondents will render SIJ status "worthless if each Special Immigrant Juvenile is nevertheless subject to removal while awaiting the opportunity to adjust status."  (*Id.* 12.)  Amici further contend that because "SIJ [status] is revocable only through a procedure prescribed by statute and regulation . . . [Respondents unlawfully] attempt[] an end-run around this revocation procedure by seeking to remove Joshua while he pursues an appeal of his removal order."  (*Id.*)

Amici further argue that Respondents propose "to remove Joshua, and potentially thousands of other Special Immigrant Juveniles who are also [awaiting visas], on the very ground this [SIJ] statute waives—because he arrived in the United States without inspection. Such a removal would violate the statute and subvert congressional intent."  (*Id.* 18.)  Amici survey the legislative history underlying the SIJ statutes, including the statutory waiver of certain grounds of removability, remarking that "[e]ach of these congressional actions reflects an unmistakable intent to permit SIJ [status] beneficiaries to remain in the United States to pursue lawful permanent residency, absent independent and legally sufficient reasons to remove them." (*Id.* 15.)  Amici contend that Respondents' arguments, "that it can deprive a SIJ [status] beneficiary of all the advantages of SIJ [status] through removal . . .  are irreconcilable with the intent and purposes of the laws giving rise to SIJ [status]."  (*Id.* 23.)

Lastly, Amici express concerns that, from a policy perspective, the "repercussions of this case are wide-reaching."  (*Id.* 28.)  Although thousands of SIJ status grantees are in the same position as Joshua—that is, awaiting visa availability and the corresponding ability to seek adjustment of status—Amici assert that Respondents' "position in this case is that each and every

one of them is subject to removal." (*Id.* 29.)  Amici remark that "[i]f allowed to prevail in this case, [Respondents'] position would place thousands of children at risk, despite the protections Congress enacted for their benefit." (*Id.*)

> **D.**  **The Court Held a Hearing to Discuss the Status of Joshua's Removal Proceedings and BIA Appeal, After Which Both Parties Submitted Additional Information**

At the December 10, 2019 status conference, Respondents informed the Court that Joshua's appeal of his "motion to reopen remains pending at the BIA" and Joshua "remains at [Immigration Centers of America] Farmville here in the Eastern District" of Virginia.  (Tr. 3.) Respondents clarified that they could not make "any representation about the amount of time it will take before the BIA rules." (*Id*. 4.)  Respondents further stated that Joshua's "SIJ classification-related claims . . . are live issues in the BIA." (*Id*.)  Respondent confirmed that absent this Court's stay, Joshua would have been removed from the United States.  (*Id.* 11.)

Respondents further averred that if the BIA denied Joshua's motion to reopen, then he "would have the ability to file a petition for review with the applicable court of appeals." (*Id*. 6.) At the status hearing, Respondents argued that Joshua faced no "procedural impediment that would prevent [him] from continuing to litigate the case from Honduras," (*id*. 12), and that Joshua's case did not meet the "specific set of circumstances for home country danger or inability to litigate" his case from Honduras, (*id*. 13).

The Court then asked for "the government's position about what constitutes Joshua's criminal history." (*Id*. 18.)  Respondents explained that "there was an allegation in the petition that referenced the criminal history, and therefore [Respondents] put it in the brief as a matter of information." (*Id*.)  When the Court stated, "I just want to be clear because there is no criminal history because there's no charge," (*id*. 19), Respondents answered, "[that]'s correct, Your

Honor," (*id*.)  Respondents emphasized that Joshua is not "being removed because of that [criminal] investigation" and "[h]is SIJ classification is not being revoked because of that."  (*Id*.)

The Court asked Respondents several questions regarding how Joshua's removal may impact his SIJ status or his ability to return to the United States should he win his BIA appeal. Specifically, the Court asked Respondents whether "Joshua could pursue his SIJ status from Honduras if he were not present in the United States."  (Tr. 20–21.)  Counsel for Respondents acknowledged the "definition of SIJ classification" includes "presence" in the United States, and that, if removed to Honduras, Joshua "would no longer be physically present in the United States."  (Tr. 21.)  Counsel for Respondents then argued that Joshua could regain his SIJ classification if "he were returned" to the United States, but did not direct the Court toward any authority for that proposition apart from a frequently asked questions website that USCIS operates, which may reflect USCIS policy regarding immigrant removals and returns.  (*Id*. 22.)

The Court also asked Respondents if any case examines potential exceptions to the removal process when a person has received SIJ status.  Respondents answered that "between the Court and counsel" looking for such a case, "there isn't one.  And what I mean by that is a case that deals with the overlap of an individual who's been classified SIJ and who also alleges that he or she cannot continue with the administrative process and petition for review process by virtue of home country danger."  (*Id*. 14–15.)  Respondents maintained that this Court lacked jurisdiction because Joshua had certain procedural processes available to him and did not meet the home-country danger exception.  (*Id*. 47.)

At the status hearing, Counsel for Joshua stated in response that "the more fundamental piece [of Joshua's case] is that once he is removed from the country, he is no longer physically present, and he automatically loses his SIJ status."  (*Id*. 30.)  Counsel for Joshua noted that

Respondents relied "solely on a nonbinding policy directive and a set of frequently asked questions from a website as their assurance that there is an adequate procedure" for Joshua to retain his SIJ status. (*Id.*)  Both parties acknowledged that Joshua's SIJ status, lack of meaningful criminal history, and imminent deportation made this an unusual case. (*Id.* 18, 35–36, 76.)  Given the complex and novel issues raised at the status hearing, neither party objected to an additional extension of the temporary stay. (*Id.* 35–36, 76.)

At the end of the hearing, the Court extended the temporary stay an additional sixty days to February 24, 2020.  The Court ordered that the parties jointly supplement the record and submit limited briefing to address additional issues raised during the hearing.  The Court also provided Respondents the opportunity to respond to the Amicus Brief.  The Court ordered the Parties to provide a final status update no later than February 10, 2020, regarding Joshua's related immigration proceedings. (Dec. 11, 2019 Order, ECF No. 37.)

In the jointly-filed supplement to the record filed on January 10, 2020, the Parties presented information regarding Joshua's December 2, 2019 custody review that took place before USCIS. (J. Stip. R., ECF No. 40.)  In that supplement, Counsel for Joshua submitted documentation showing that Joshua has no other criminal history apart from his traffic offenses. (J. Stip. R. 2–3, ECF No. 40–2.)  Documents showed that Counsel for Joshua had "again implore[d]" the Office of Enforcement and Removal Operations to send legal information to Joshua's attorneys, which the office repeatedly failed to do "despite having a G-28 on file and having had several email exchanges with [Officer Torres] and Officer Paul Trump." (*Id.* 2.)  On December 6, 2019, following Joshua's custody review, USCIS issued a one-page letter informing Joshua that it had reviewed his "custody status" and "it [had] determined that [Joshua] will not be released from the custody of U.S. Immigration and Customs Enforcement (ICE) at

this time." (J. Stip. R., ECF No. 40-4.)  Specifically, USCIS found that Joshua's "illegal entry, criminal history and Final Order of Removal deem [him] a flight risk and a danger to the community." (*Id.*)  Apart from that sentence, the letter made no specific statements about Joshua's case. (*Id.*)

In response to the Amicus Brief, also filed on January 10, 2020, Respondents state that Amici made "one argument that has not yet been addressed." (Resp. 2, ECF No. 41.)  Although Amici asserted that Respondents "propose[] to remove Joshua . . . on the very ground this [SIJ] statute waives—because he arrived in the United States without inspection," Respondents argue that 8 U.S.C. § 1227(c) does not apply to Joshua because that statute addresses *deportation*. (*Id.* (quotations omitted).)  Respondents instead claim that Joshua is being *removed* under 8 U.S.C. § 1229a "for having been *inadmissible* under 8 U.S.C. § 1182(a)(6)(A)(i) because of his initial unlawful entry." (*Id.*)  Respondents cite *Vasquez-Hernandez v. Holder*, in support of the argument that "[w]hether an alien is *removable* in the first instance depends on whether the alien is *inadmissible* or *deportable*."[10] (*Id.* (citing 590 F.3d 1053, 1055 (9th Cir. 2010) (quotations omitted).)  Because Joshua is not being *deported* but is instead being *removed*, Respondents contend that Amici raise an irrelevant argument regarding 8 U.S.C. § 1227. (*Id.* 3.)

Respondents repeat that Joshua may pursue his motion to reopen from Honduras and that he has not established that specific circumstances that would preclude him from doing so. (*Id.* 5–6.)  Respondents point to *Mejia v. Sessions* for the proposition that courts find the administrative review process inadequate only when "petitioners allege that they would face

---

[10] Generally speaking, in removal proceedings an immigration judge decides whether a noncitizen is inadmissible to or deportable from the United States.  8 U.S.C. § 1229(a).  The grounds of inadmissibility may apply if a person is seeking admission to the United States.  The grounds of deportability may apply to a person whom the United States has admitted as either an immigrant or a non-immigrant.

country-wide threats or persecution that would prohibit them from pursuing the administrative process and petition for review from anywhere in their home countries." (*Id.* 4–6 (citing *Mejia v. Sessions*, 866 F.3d 573, 590 (4th Cir. 2017))).  Because Joshua has not alleged home country danger, Respondents see no reason why the administrative review proves inadequate for the relief he seeks. (*Id.* 6.)

On January 28, 2020, Amici filed a reply brief to address Respondents' arguments regarding the SIJ statutory framework. (Reply Br., ECF No. 45.)  On February 10, 2020, the Parties informed the Court that Joshua's appeal remains pending before the BIA and he remains in detention in Farmville, Virginia. (Feb. 10, 2020 Notice, ECF No. 46.)

Having received additional briefing and updates, the Court turns to the merits of the Motion to Dismiss.

### III. Standard of Review: Rule 12(b)(1)

Federal district courts are courts of limited subject-matter jurisdiction. *United States ex rel. Vuyvuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005)).  This Court must, as a result, determine whether it has jurisdiction over the claims at issue. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).  "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . ." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move to dismiss a plaintiff's complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "A district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018).  "A court's determination of subject matter jurisdiction addresses whether the court has the authority to entertain a particular kind of case, not whether a claim for relief is viable under a particular construction of a statute."  *Upstate Forever, L.P.*, 887 F.3d at 645–46.

A motion to dismiss brought pursuant to Rule 12(b)(1) can attack subject-matter jurisdiction in two ways.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  First, a Rule 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject-matter jurisdiction can lie.  *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *Adams*, 697 F.2d at 1219).  "When a defendant makes a facial challenge to subject matter jurisdiction, the plaintiff, in effect, is afforded the same procedural protection as he [or she] would receive under a Rule 12(b)(6) consideration."  *Kerns*, 585 F.3d at 192.  In such a challenge, a court assumes the truth of the facts alleged by plaintiff.[11]  *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338.

---

[11]  In accordance with the Rule 12(b)(6) Motion to Dismiss standard, the Court must accept the well-pleaded factual allegations in the Petition as true and draw all reasonable inferences in favor of Joshua.  *Kensington Volunteer Fire Dep't v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

Alternatively, a Rule 12(b)(1) motion may challenge the existence of subject-matter jurisdiction in fact, apart from the pleadings.  When a litigant raises a Rule 12(b)(1) motion to challenge "the factual basis for subject matter jurisdiction," the petitioner bears "the burden of proving subject matter jurisdiction." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  In such a case, because a party challenges the court's "'very power to hear the case,'" the trial court may weigh evidence to determine the existence of jurisdiction.  *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338.; *see also Adams*, 697 F.2d at 1219.

In sum, when a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged.  *Kerns*, 585 F.3d at 193.  On the other hand, when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts.  *Id.* "And when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous."  *Kerns*, 585 F.3d at 193; *see also Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 368 F. Supp. 3d 889, 893 (E.D. Va. 2019) ("When such a factual challenge is made to jurisdiction, the jurisdictional facts must be determined with the same procedural safeguards as afforded through a motion for summary judgment").

24

Here, Respondents challenge Joshua's § 2241 Petition on the first ground, arguing that the Court must dismiss this action because Joshua's § 2241 Petition fails to establish subject matter jurisdiction on its face.[12]  (Mem. Supp. Mot. Dismiss 1–2.)  Accordingly, at this stage of the litigation, the Court assumes as true the allegations in Joshua's § 2241 Petition.

## IV. Statutory Framework

To resolve whether this Court has subject matter jurisdiction to hear Joshua's § 2241 Petition, the Court first summarizes the SIJ Statutes and the United States' basis for removing Joshua.  Second, the Court examines 8 U.S.C. § 1252(g), which purportedly strips this Court of habeas jurisdiction.  Lastly, the Court discusses the writ of habeas corpus statute, 28 U.S.C. § 2241, in conjunction with the Suspension Clause.

### A.       Joshua Successfully Completes the SIJ Status Application Process

The Immigration and Nationality Act (the "INA") largely governs immigration law.  First enacted in 1952, Congress has amended the INA several times.  *See, e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. 289, 297 (2001) (discussing amendments to various sections of the INA over time).  In 1996, for example, Congress amended the INA through the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996).  "IIRIRA established 'admission' as the key concept in immigration law and

---

[12] At the December 2019 Status Conference, Respondents reiterated this position, confirming that "for the purpose of this motion. . . we are not . . . contesting the allegation[s] in [the] petition. . . .  So the credibility or not of the allegations is, for purposes of this motion, is not at issue."  (Tr. 52–53.)

The Parties have not requested discovery or an evidentiary hearing to resolve this Rule 12(b)(1) Motion to Dismiss, which further supports the notion that Respondents bring only a facial challenge to the § 2241 Petition.  Because the jurisdictional allegations raised here are not clearly immaterial or wholly frivolous, the Court finds that the better course of action is to allow the case to proceed in order to consider any necessary discovery or evidence.  *Kerns*, 585 F.3d at 193 (directing that "when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless . . . allegations are clearly immaterial or wholly unsubstantial and frivolous").

defines the term as 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018).[13]

Critical to the case at bar are the INA statutes concerning SIJ status, as the Court must consider how such status may affect Joshua's claims.[14]  In 1990, Congress established SIJ status "to protect abused, neglected or abandoned children who, with their families, illegally entered the United States, and it entrusted the review of SIJ petitions to USCIS, a component of [the Department of Homeland Security]." *Osorio-Martinez v. Attorney Gen. United States of Am.*, 893 F.3d 153, 163 (3d Cir. 2018) (internal quotation marks and citations omitted).  In creating SIJ status, Congress included in the INA certain protections against removal for this class of young immigrants.  Immigration Act of 1990, Pub. L. No. 101–649, November 29, 1990, 104

---

[13]  IIRIRA also provided that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." *E. Bay Sanctuary Covenant*, 932 F.3d at 756 (quoting 8 U.S.C. § 1182(a)(6)(A)(i)).  That statute provides the basis for Joshua's removal order.  Joshua has since received SIJ status-based parole.

[14]  Courts refer to "deportation" and "removal" interchangeably at times.  This reflects a change in the statutory language since the INA's enactment.  As the Supreme Court has recognized, "[t]he changes to our immigration law have also involved a change in nomenclature; the statutory text now uses the term 'removal' rather than 'deportation.'" *Padilla v. Kentucky*, 559 U.S. 356, 364 n.6 (2010); *see also Nguyen v. Sessions*, 901 F.3d 1093, 1096 (9th Cir. 2018) (stating that prior to enactment of IIRIRA, removal and deportation "occurred in different procedural settings," but since then, "the Government has used a unified procedure, known as a 'removal proceeding,' for exclusions and deportations alike").

As discussed in this memorandum opinion, the Court recognizes the technical differences between inadmissibility, deportability, and removability.  For example, the burden of proof in removal proceedings differs depending on an alien's immigration status at the time USCIS commences his or her proceedings.  *See Ibragimov v. Gonzales*, 476 F.3d 125 (2d. Cir 2007).  An "applicant for admission" bears the burden of proving he or she is not inadmissible under 8 U.S.C. § 1182, while the government bears the burden of showing removability when a noncitizen has been lawfully admitted to the United Stat es.  8 U.S.C. §§ 1229a(c)(2)–(3).  In a removal proceeding commenced after an alien has been formally "admitted" to the country, the United States has the burden of establishing by "clear and convincing evidence" that "the alien is deportable."  8 U.S.C. § 1229a(c)(3)(A).

Stat 4978.  Section 153 of the 1990 Act provided that certain removal grounds contained in then 8 U.S.C. § 1251 "shall not apply to a special immigrant described in section 101(a)(27)(J) based upon circumstances that exist before the date the alien was provided such special immigrant status."  *Id.* § 153(b).

Accordingly, a juvenile who received SIJ status could be removed on certain grounds, such as serious criminal convictions, *but could not be removed for having the entered the country somewhere other than at an official checkpoint.  See* 8 U.S.C. § 1227(c).[15]

Congress has amended the statute providing for SIJ status, currently codified at 8 U.S.C. § 1101(a)(27)(J), at various points over its thirty-year history.  The amendments generally reflect Congressional intent to grant vulnerable young immigrants legal protections.  *See R.F.M.*, 365 F. Supp. 3d at 363 (discussing SIJ legislative history and congressional efforts to expand SIJ status eligibility over time).  As the United States Court of Appeals for the Fourth Circuit recently explained, Congress has consistently engaged in "efforts to expand eligibility for SIJ status and increase protections for vulnerable immigrant children."  *Perez v. Cuccinelli*, No. 18-1330, 2020 WL 611530, at *10 (4th Cir. Feb. 10, 2020).  In 2008, for instance, Congress revised the SIJ statute through "the William Wilberforce Trafficking Victims Protection Reauthorization Act" to enhance "efforts to combat the trafficking of children, particularly unaccompanied immigrant minors."  *Perez*, 2020 WL 611530, at *10.

---

[15] Section 1227(c), entitled, "Waiver of grounds for deportation," currently provides:

Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of inadmissibility described in paragraph (2) or (3) of section 1182(a) of this title) shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title based upon circumstances that existed before the date the alien was provided such special immigrant status.

8 U.S.C. § 1227(c).

As currently defined in the INA, an SIJ is "an immigrant who is ***present in the United States***":

> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

> (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

8 U.S.C. § 1101(a)(27)(J) (emphasis added).

Pursuant to § 1101(a)(27)(J), applicants must complete a two-step process before receiving SIJ status.  First, the juvenile must apply to a state "juvenile court" for a predicate order finding that:

> (1) The juvenile is under the age of 21 and is unmarried;

> (2) Reunification with one or both of the juvenile's parents is not viable due to abuse, neglect, or abandonment or a similar basis under state law;

> (3) It is not in the best interest of the juvenile to be returned to his parents' previous country of nationality or last habitual residence;

> (4) The juvenile is dependent on the state court or has been placed under the custody of an agency or an individual appointed by the court; and

> (5) The state court has jurisdiction under state law to make judicial determinations about the custody and care of juveniles.  *See* 8 U.S.C. § 1101(a)(27)(J)(i), (ii); 8 C.F.R. § 204.11(a), (c), (d).

8 U.S.C. § 1101(a)(27)(J).

Second, the juvenile must submit an application to USCIS, which includes the state juvenile court order, demonstrating his or her statutory eligibility.  *See Perez v. Cissna,* 914 F.3d

846, 849–50 (4th Cir. 2019), *on reh'g en banc sub nom. Perez v. Cuccinelli*, No. 18-1330, 2020 WL 611530 (4th Cir. Feb. 10, 2020) ("To become an SIJ, an immigrant child must apply for that status with the Agency.").  After satisfying these two steps, the Secretary of Homeland Security, generally through USCIS's directors, must consent to the grant of SIJ status for each applicant, which functions as an acknowledgement that the applicant made a bona fide request for SIJ classification*.  Osorio-Martinez*, 893 F.3d at 170; 8 U.S.C. §§ 1101(a)(27)(J)(i), (ii); 8 C.F.R. § 204.11.

In accordance with this process, juvenile immigrants like Joshua receive SIJ status only after:  (1) satisfying a set of rigorous, congressionally-defined eligibility criteria, including that a juvenile court found that it would not be in the child's best interest to return to his or her country of last habitual residence and that the child is dependent on the court or placed in the custody of the state or someone appointed by the state; and, (2) USCIS approves of the application and the Secretary of Homeland Security consents to the applicant receiving SIJ status.  8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c).  As a result, receiving SIJ status establishes "a successful applicant as a ward of the United States with the approval of both state and federal authorities." *Osorio-Martinez*, 893 F.3d at 168.

**B.      SIJ Status Provides Benefits and Protections Against Some Forms of Removal**

SIJ status, once received, provides significant benefits for young immigrants and certain protections against removal.  *See* 8 U.S.C. § 1255.  "If an applicant obtains SIJ status, he or she is potentially eligible for lawful permanent resident status.  If an SIJ is granted lawful permanent resident status, he or she may eventually apply for United States citizenship." *Perez*, 914 F.3d at 849–50; *see also Perez*, 2020 WL 611530 at *14 (observing in dissent that "[t]he benefits of

obtaining SIJ status can be substantial. . .  SIJ status makes [individuals] eligible for lawful permanent status, waiving potentially disqualifying facts such as his [or her] unlawful entry").

Other provisions dealing with SIJ applications and eligibility for adjustment of status are found in 8 U.S.C. § 1255(a) and § 1255(h).  Those two subsections provide:

(a) Status as person admitted for permanent residence on application and eligibility for immigrant visa.

The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification under subparagraph (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 1154(a)(1) of this title or may be adjusted by the Attorney General, in his [or her] discretion and under such regulations as he [or she] may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him [or her] at the time his application is filed.

(h) Application with respect to special immigrants

In applying this section to a special immigrant described in section 1101(a)(27)(J) of this title-

(1) such an immigrant *shall* be deemed for purposes of subsection (a) of this section, to have been *paroled* into the United States; and

(2) *in determining the alien's admissibility as an immigrant*—

(A) paragraphs (4), (5)(A), *(6)(A)*,[16] (6)(C), (6)(D), (7)(A), and (9)(B) of section *1182(a) of this title shall not apply*; and

(B) the Attorney General may waive other paragraphs of section 1182(a) of this title (other than paragraphs (2)(A), (2)(B), (2)(C) (except for so much of such paragraph as related to a single offense of simple possession of 30 grams or less of marijuana), (3)(A), (3)(B), (3)(C), and (3)(E)) in the case of individual aliens for humanitarian purposes, family unity, or when it is otherwise in the public interest.

---

[16] Respondents confirmed that the United States bases Joshua's removal on 8 U.S.C. § 1182(a)(6)(A)(1), a ground for removal that "shall not apply" to a person who has successfully applied for SIJ status.  8 U.S.C. § 1255(h); (Tr. 9).

> The relationship between an alien and the alien's natural parents or prior adoptive parents shall not be considered a factor in making a waiver under paragraph (2)(B). Nothing in this subsection or section 1101(a)(27)(J) of this title shall be construed as authorizing an alien to apply for admission or be admitted to the United States in order to obtain special immigrant status described in such section.

8 U.S.C. § 1255 (emphasis added).

In a case involving the expedited removal of juvenile immigrants, the United States Court of Appeals for the Third Circuit recently examined these statutes and explained the importance of SIJ status and the benefits such status confers:

> SIJ classification conveys a host of important benefits. For purposes of 8 U.S.C. § 1255(a), which describes adjustment of status, SIJ designees are "deemed . . . to have been paroled into the United States." 8 U.S.C. § 1255(h)(1). Moreover, the INA automatically exempts SIJ designees from a set of generally applicable grounds of inadmissibility and provides that other grounds of inadmissibility also may be waived at the Attorney General's discretion. 8 U.S.C. §§ 1255(h)(2), 1182(a). Of particular note, the INA exempts SIJ designees from inadmissibility based on the lack of "valid entry document[s]," *id.* § 1182(a)(7)(A)(i)(I)—the very ground on which the Government alleges Petitioners are eligible for expedited removal. App. 437 (citing 8 U.S.C. § 1225(b)(1)). Additionally, Congress has granted SIJ designees various forms of support within the United States, such as access to federally funded educational programming and preferential status when seeking employment-based visas. *See id.* §§ 1232(d)(4)(A), 1153(b)(4).
>
> Finally, SIJ status, once granted, may not be revoked except "on notice," 8 C.F.R. § 205.2, and upon the Government's compliance with a series of procedural safeguards: The Secretary of Homeland Security must find "good and sufficient cause" for revocation; the agency must provide notice of intent to revoke; and the SIJ designee must be given the opportunity to present evidence opposing revocation. 8 U.S.C. § 1155; 8 C.F.R. § 205.2; *see also* 7 USCIS Policy Manual, pt. F, ch. 7 (Mar. 21, 2018).
>
> The SIJ designee also has the right to appeal any adverse ruling, initially to the Associate Commissioner for Examinations, 8 C.F.R. § 205.2(d), and then to the extent the child claims he or she "suffer[ed] legal wrong because of agency action," to the federal courts.

*Osorio-Martinez*, 893 F.3d at 163–64.

Here, the parties agree that Joshua received SIJ status from USCIS following successful litigation in the class action lawsuit *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350 (S.D.N.Y. 2019). Considering the benefits Joshua's SIJ status confers, which sets his case apart from other § 2241 proceedings, the question at the heart of this dispute is whether his SIJ status legally alters the Court's jurisdiction to consider the arguments raised in his § 2241 Petition.  To help answer that question, the Court examines next how SIJ classification impacts adjustment of status, inadmissibility, deportability, and removal.

### C. Joshua's SIJ Designation Impacts his Immigration Status Because the Statute Deems Him Paroled Into the United States

"An alien who enters the United States without required documentation, and who remains present here, is deportable.  The INA and its regulations offer several avenues by which such an alien may seek relief from deportation and lawfully remain in the United States."  *Xing Yang Yang v. Holder*, 770 F.3d 294, 296 (4th Cir. 2014), *as amended* (Nov. 5, 2014).  SIJ status presents one statutory avenue that may provide relief from removal in some instances because it allows young immigrants to be deemed "paroled" into the United States for adjustment of status purposes.  "Adjustment of status is another distinct form of relief, and does not focus on the effects of removal.  Rather, such relief permits the Attorney General, in his [or her] discretion, to adjust a deportable alien's status to that of lawful permanent resident."  *Id*. at 296.

Notably, in the immigration context, not all types of parole are treated equally.  Parole generally comprises "an administrative practice whereby the government allows an arriving alien who has come to a port-of-entry without a valid entry document to be temporarily released from detention and to remain in the United States pending review of his immigration status."  *Ibragimov v. Gonzales*, 476 F.3d 125, 131 (2d Cir. 2007) (stating that parole pursuant to 8 U.S.C. § 1182(d)(5)(A) "does not constitute an admission").  The definition, scope, and the

consequences of parole may vary based on the wording and placement of a statutory provision. *See Matter of Castillo–Padilla*, 25 I. & N. Dec. 257, 258 (BIA 2010) (holding that "conditional parole" under § 1226(a)(2)(B) is a "distinct and different procedure" from "parole" under § 1182(d)(5)(A)); *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir. 1984) (*en banc*) ("Congress has delegated remarkably broad discretion to executive officials under the [INA], and these grants of statutory authority are particularly sweeping in the context of parole."), *aff'd in part on nonconstitutional grounds*, 472 U.S. 846 (1985).  In the case at bar, the Court must consider SIJ-based parole.

### 1.  SIJ-Based Parole Alters Joshua's Status for Purposes of Adjustment

Joshua's SIJ status puts him in a special parole status.  In particular, 8 U.S.C. § 1255(h) provides that "[i]n applying this section to a special immigrant [like Joshua] such an immigrant *shall* be deemed, for purposes of subsection (a) of this section, to have been *paroled* into the United States."  8 U.S.C. § 1255(h)(1) (emphasis added).  In accordance with this statute, Joshua has been deemed "paroled" into the United States for purposes of adjustment.  8 U.S.C. § 1255(h).[17]

Adjustment of status refers to the process an individual, like Joshua, can use to apply for lawful permanent resident status when present in the United States.  INA Section 245, codified at 8 U.S.C. § 1255, authorizes nonimmigrant aliens to apply for an adjustment of status.  8 U.S.C. § 1255.  To apply for permanent residency, the applicant must not be "removable" from the United States.  An application for adjustment of status *cannot* be filed by someone who is not in the United States, 8 U.S.C. § 1255(i); 8 C.F.R. § 245.1(a), and the application is deemed

---

[17] Although the Attorney General has not made an individual determination of parole for Joshua under 8 U.S.C. § 1182(d)(5)(A), the categorical grant of parole status to SIJ immigrants specifically singles out the purpose of the parole status as opening the door to review of an adjustment application.  8 U.S.C. § 1255(h).

*abandoned* if the applicant leaves the country without having been granted advance parole. 8 C.F.R. § 245.2(a)(4)(ii)(A)-(B). Regulations similarly confirm that a "special immigrant described under section 101(a)(27)(J) of the Act shall be deemed, for the purpose of applying the adjustment to status provisions of section 245(a) of the Act, to have been paroled into the United States, regardless of the actual method of entry into the United States." 8 C.F.R. § 245.1(a).[18]

Case law likewise explains that "[a]n alien granted SIJ status is deemed paroled into the United States for purposes of applying for an adjustment of status to that of permanent resident, despite not having been inspected and admitted or otherwise paroled into the United States." *United States v. Garcia*, 707 F. App'x 231, 232 (5th Cir. 2017). Joshua's SIJ status, deeming him "paroled into the United States," relates to whether this Court has jurisdiction to hear Joshua's § 2241 Petition because that status impacts (1) whether the Court has jurisdiction to hear Joshua's specific claims considering the various statutes as-applied to him; and, (2) whether Respondents may lawfully deport him under the circumstances present here.[19] As such, Joshua's

---

[18] Regulations codified at 8 C.F.R. § 245.1 address adjustment of status for permanent residence in the United States. That regulation makes clear that "[n]either the provisions of section 245(c)(2) nor the exclusion provisions of sections 212(a)(4), (5)(A), or (7)(A) of the Act shall apply to a qualified special immigrant [juvenile] under section 101(a)(27)(J) of the Act." 8 C.F.R. § 245.1(e)(3)

[19] While potentially eligible for lawful permanent resident status, *Reyes v. Cissna*, 737 F. App'x 140, 142 (4th Cir. 2018), a person who has received SIJ status, like Joshua, may wait years for the opportunity to file for adjustment of status. The delay comes from the prohibition against filing a Form I-485 application, (the form used to apply for register permanent residence or adjustment of status), until a visa becomes available. Because federal law imposes limits on the number of immigrants from a given country who may receive visas during each fiscal year, 8 U.S.C. §§ 1151, 1153, a visa is not always immediately available to each person who has received SIJ status, 8 C.F.R. § 245(g)(1). As a result, immigrants from Honduras, like Joshua, are forced to apply for adjustment of status to become a permanent resident using a staggered timeline based on visa availability. *See Osorio-Martinez*, 893 F.3d at 160 n.3 (discussing delays and timeline for receiving visas). The Immigration Judge here so noted. And in *Osorio-Martinez*, for instance, petitioners had "their [lawful permanent resident] applications pending for close to two years" when the Third Circuit issued its opinion in that case. 893 F.3d at 175.

SIJ status must be considered in the context of inadmissibility and deportability under the terms

of the INA.  Respondents proceed under the theory that Joshua is inadmissible, but a careful

analysis of these statutes indicates otherwise.

### 2.   Inadmissibility and Deportability

In response to the Amicus Brief, Respondents contend that whether an alien

is removable in the first instance depends on whether the alien is inadmissible or deportable.  For

purposes of the instant Motion to Dismiss, the Court briefly addresses the statutes concerning

inadmissibility and deportability.

"Federal immigration law governs both the exclusion of aliens from admission to this

country and the deportation of aliens previously admitted."  *Judulang v. Holder*, 565 U.S. 42, 45,

(2011).  Non-citizens of the United States do not constitute a single, homogenous group that

receives identical treatment or benefits under federal immigration laws.  Rather, the immigration

laws of the United States have "historically distinguished between aliens who have 'entered' the

United States and aliens still seeking to enter (whether or not they are physically on American

soil)."  *Jama v. Imm. & Customs Enf't*, 543 U.S. 335, 349 (2005) (citing *Leng May Ma v.*

*Barber*, 357 U.S. 185, 187 (1958) ("It is important to note at the outset that our immigration laws

have long made a distinction between those aliens who have come to our shores seeking

admission . . . and those who are within the United States after an entry, irrespective of its

legality.")).

---

The Third Circuit concluded that, by the time it had resolved that appeal, "[p]etitioners' receipt of visas [was] imminent."  The Third Circuit found that under the specific circumstances, including petitioners' SIJ status and "proximity to LPR status with its even fuller range of rights, as further evidence of their meaningful and substantial connection with the United States" warranted invoking the Suspension Clause.  *Osorio-Martinez*, 893 F.3d at 175.

Because Respondents challenge only this Court's jurisdiction, the question of whether Joshua may immediately receive a visa cannot be addressed in the instant Rule 12(b)(1) Motion to Dismiss.

As a result, immigration proceedings, as historically understood, comprised two distinct sets of proceedings depending on the position of the alien—inadmissibility proceedings and deportation proceedings. "An inadmissible alien is one who was not admitted legally to the United States and is removable under § 1182, whereas a deportable alien is in the United States lawfully and is removable under § 1227." *Vasquez-Hernandez*, 590 F.3d at 1055. Before 1996, "these two kinds of actions occurred in different procedural settings," but since Congress enacted the IIRIRA, "the Government has used a unified procedure, known as a 'removal proceeding,' for exclusions and deportations alike." *Judulang*, 565 U.S. at 45–46 (citing 8 U.S.C. §§ 1229, 1229a).

Despite eliminating these discrete forms of proceedings, the INA retained the distinction between inadmissibility and deportability by retaining separate statutory provisions for each form of removal. IIRIRA § 304(a)(3); *see* 8 U.S.C. §§ 1229, 1229a. Although officially distinct, these statutory provisions have significant overlap. For instance, the conviction or commission of a crime involving moral turpitude can subject an alien to both inadmissibility and deportability. *Compare* 8 U.S.C. § 1182(a)(6)(A)(i)(I) *with* 8 U.S.C. § 1227(a)(2)(A)(i). Aliens are both inadmissible and deportable on identical security-related grounds, for engaging in terrorist activities, for participating in Nazi-related persecution and genocide, and for committing severe violations of religious freedom. *Compare* 8 U.S.C. § 1182(a)(3), *with* 8 U.S.C. § 1227(a)(4). Alien smuggling provides grounds for both inadmissibility and deportability, as does making a false claim of United States citizenship.[20] *Compare* 8 U.S.C. § 1182(a)(6)(E)(i),

---

[20] Additionally, an "applicant for admission" bears the burden of proving he or she is not inadmissible under 8 U.S.C. § 1182, while the government bears the burden of showing removability when a noncitizen has been lawfully admitted to the United States. 8 U.S.C. § 1229a(c)(2)–(3). Grounds for inadmissibility and deportability do not match, as some conduct and offenses may render a person inadmissible but not deportable, and vice versa. *See, e.g.*, *id*.

*with* 8 U.S.C. § 1227(a)(1)(E); *compare* 8 U.S.C. § 1182(a)(6)(C)(ii), *with* 8 U.S.C.

§ 1227(a)(3)(D).

Yet there are important differences between the two classes of "removable" immigrants.

Some of these distinctions relate to systemic differences.  Because inadmissibility targets those

who are generally not yet in the United States, whereas deportability targets those who are

present in the United States, aliens who have been previously ordered removed or have accrued a

period of unlawful presence in the United States are *inadmissible*.  8 U.S.C. § 1182(a)(9)

(inadmissibility because of prior order of removal or the accrual of unlawful presence in the

United States).  Similarly, aliens may be charged with inadmissibility on health-related grounds,

*i.e.*, that they have an infectious or dangerous disease.  8 U.S.C. § 1182(a)(1) (certain aliens may

be inadmissible because of health-related grounds).  In contrast, an alien may become *deportable*

following the expiration or termination of his or her period of lawful residence in the United

States, or be deportable because, at the time of his or her entry, he or she was inadmissible to the

United States.  *See* 8 U.S.C. § 1227(a)(1)(A)–(B); *but see* 8 U.S.C. § 1182(a)(6)(A)(i) (an alien

present in the United States without having been admitted or paroled is inadmissible, a point

especially important in the context of adjustment of status where an alien will have to establish

his or her admissibility).

---

§ 1227(a)(2)(C) (creating removability for "[c]ertain firearm offenses," a ground that is not
present in 8 U.S.C. § 1182(a)(2)); *compare id.* § 1227(a)(2)(B)(i) (allowing an exception to
controlled substance offense removability for "a single offense involving possession for one's
own use of 30 grams or less of marijuana"), *with id.* § 1182(a)(2)(A)(i)(II) (allowing no such
exception in the parallel inadmissibility ground).  And admitting to committing acts that
"constitute the essential elements of" a specified offense may make an applicant inadmissible,
while, in most cases, a conviction is required to make a noncitizen deportable for commission of
a crime.  *Compare id.* § 1182(a)(2)(A)(i), *with id.* § 1227(a)(2)(A).  In sum, the INA presents a
labyrinth of incongruities that courts and parties alike must navigate.

Specifically, Section 1182, titled "[i]nadmissible aliens," begins with the header "[c]lasses of aliens ineligible for visas or admission."[21]  8 U.S.C. § 1182(a).  Under the statute's plain language, a noncitizen is "inadmissible" in the context of seeking a visa or admission, and not otherwise.  8 U.S.C. § 1182; *see also* 8 C.F.R. § 235.1(f)(2) (noting that a noncitizen "present in the United States who has not been admitted or paroled" or "who seeks entry at other than an open, designated port-of-entry . . .  is subject to" the inadmissibility grounds at 8 U.S.C. § 1182(a)).  Respondents cite § 1182(a)(6)(A)(i), relating to inadmissibility, as the grounds for Joshua's removal.[22]

In contrast, Section 1227, titled "[d]eportable aliens," begins with classes of deportable aliens:  "[a]ny alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens."  8 U.S.C. § 1227(a).  Section 1227(c) states that grounds of inadmissibility described in that statute "shall not apply to a special immigrant described in section 1101(a)(27)(J) . . . based upon circumstances that existed before the date the alien was provided such immigrant status."  8 U.S.C. § 1227(c).  Respondents contend that this provision does not apply to Joshua because he is being removed, not deported.  Respondents assert that Joshua "is instead being removed under 8 U.S.C. § 1229a for having been inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) because of his initial unlawful entry."  (Resp. 2, ECF No. 41.)  Once an immigrant is found removable, he or she may seek relief from removal through cancellation

---

[21] Statute headings and titles are merely informative and "are not meant to take the place of the detailed provisions in the text."  *Bhd. of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528 (1947).

[22] As mentioned above, 8 U.S.C. § 1255(h) states that, this section—§ 1182(a)(6)(A) — *shall not apply* to young immigrants who have received SIJ status.  Because, as discussed below, 8 U.S.C. § 1255(h) appears to potentially negate the basis for Joshua's removal, the Court finds the allegations in his § 2241 Petition sufficient to overcome Respondents' Motion to Dismiss.

of removal pursuant to 8 U.S.C. § 1229b.  "Unlike the removal statutes, cancellation

of removal does not treat inadmissible and deportable aliens differently."  *Vasquez-Hernandez*,

590 F.3d at 1055.

Assuming without deciding that Respondents are correct that Joshua is being *removed* as

inadmissible pursuant to 8 U.S.C. § 1229a, the Court turns next to whether Joshua's § 2241

Petition states a claim that survives Respondents' Rule 12(b)(1) Motion to Dismiss after

considering his SIJ status and the relevant removal statutes.

> **3.    Joshua's SIJ Status May Negate the Grounds for His Removal Because, Pursuant to 8 U.S.C. § 1255(h), Such Status Waives the Grounds for Removal Set Forth in § 1182(a)(6)(A) On Which Respondents Rely**

In this Motion to Dismiss the Court need only determine whether it may have subject

matter jurisdiction based on the facial validity of the § 2241 Petition and the claims Joshua

raises.  *Upstate Forever, L.P.*, 887 F.3d at 645–46 ("A court's determination of subject matter

jurisdiction addresses whether the court has the authority to entertain a particular kind of case,

not whether a claim for relief is viable under a particular construction of a statute.").

Relevant to this portion of the subject matter jurisdiction analysis, Respondents cite

8 U.S.C. § 1182(a)(6)(A)(i) as the grounds for Joshua's removal.  That statute grants the

government authority to remove individuals who have never been admitted or paroled into the

United States.  Specifically, that subsection provides,

> An alien *present* in the United States *without being admitted or paroled*, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

8 U.S.C. § 1182(a)(6)(A)(i) (emphasis added).  Respondents also cite 8 U.S.C. § 1229a as the

statute providing the basis for Joshua's removal.  *See, e.g.*, 8 U.S.C. § 1229a(a)(2) ("An alien

placed in proceedings under this section may be charged with any applicable ground of

inadmissibility under section 1182(a) of this title or any applicable ground of deportability under section 1227(a) of this title.").

But § 1255(h) states that § 1182(a)(6)(A) "shall not apply" to a "special immigrant described in section 1101(a)(27)(J)," such as Joshua.  And § 1182 applies only to individuals not admitted or paroled, which is contrary to Joshua's circumstances.

Joshua asserts, among other things, that because his SIJ status deems him paroled into the United States at the time of his entry, 8 U.S.C. § 1182(a)(6)(A)(i) no longer provides a basis for his removal.  (§ 2241 Pet. 16 (citing 8 U.S.C. § 1255(h)).  Respondents argue that this Court need not reach that question because "this Court lacks jurisdiction over the [§ 2241] Petition." (Mem. Supp. Mot Dismiss 1; ECF No. 20.)  Respondents further contend that Joshua must follow the "administrative process followed by court of appeals review," which "provides a process for protecting his SIJ benefits, even if he is correct that removal would affect them." (Mem. Supp. Mot. Dismiss 2.)

At the December 10, 2019 status hearing, Respondents explained that in a typical removal case, "an alien who has never been admitted to the United States and applies for adjustment of status under [§] 1255, that adjustment of status can be denied on the basis of never having been admitted under this [§] 1182(a) provision."  (Tr. 9.)  But, as Respondents recognized, due to "SIJ [status] . . . that person's adjustment of status cannot be denied on that basis."  (Tr. 9.)  In other words, Joshua's "adjustment could not be denied on the basis of that initial illegal entry."  (Tr. 10.)  Nonetheless, Respondents emphasize that Joshua is facing deportability, not inadmissibility.  (Resp., ECF No. 41.)

The Court pauses to note the lack of case law on this point.  That is, neither the parties nor the Court have found a case involving the removal of an individual with SIJ status who lacks

meaningful criminal history.  Generally, it does not appear that Respondents frequently remove from the United States individuals who hold SIJ status and lack meaningful criminal history.  *But see Osorio-Martinez*, 893 F.3d at 163–64 (finding that the court had jurisdiction to hear challenge to expedited removal of young immigrants who had obtained SIJ status).  Infrequent removal of such immigrants, however, aligns with Congressional intent to have SIJ status protect vulnerable youth from leaving the United States and returning to a country where harm will come to them.

Despite the dearth of case law, *Garcia v. Holder* provides the Court with some guidance regarding the removability of those with SIJ status.  659 F.3d 1261, 1272 (9th Cir. 2011).  In that case, the United States Court of Appeals for the Ninth Circuit found "that the grant of SIJ [status]-based parole qualifies as an admission 'in any status' for cancellation of removal purposes."  659 F.3d at 1272.  The Ninth Circuit noted that Congress had given SIJ status recipients "recognition and opportunity to make contacts in this country, and for that reason [they] should not be wrenched away without adequate process."  *Id.* at 1271.  The Ninth Circuit remarked that "SIJ [status]-based parolees" were given "permission to remain in the country pending the outcome of their adjustment of status application, employment authorization, exemption from certain inadmissibility grounds applicable to other aliens."  *Id.*  The Ninth Circuit further explained that Congress wanted extra protection for SIJ-eligible minors through the applicable statutes:

> It is not surprising that the SIJ[] regulations do not mention admission . . . [because] SIJ [status]-based parolees' claims to remain in this country derive from their status as juvenile dependents of the court and their lack of viable family ties. *Cf.* 8 C.F.R. § 204.11(a).  Such parolees are unlikely to have occasion to travel abroad while their applications are pending and they remain dependents of the court.

659 F.3d at 1272.  Based on these statutory benefits, the Ninth Circuit held that a grant of SIJ

status-based parole counts as both admission and a provision of status for the individual for purposes of § 1229b(a), the statute that addresses cancellation of removal.  *Id*. at 1272.[23]

Here, the § 2241 Petition raises complex legal questions regarding the interplay of the SIJ statutes within the INA and whether Congress has waived certain grounds for removal regardless of how the juvenile entered the United States.  The Court does not yet resolve this claim on its merits, however, because, at this stage of the litigation, Respondents argue only that 8 U.S.C. § 1252 strips this Court of jurisdiction to consider Joshua's habeas petition, including his claims that his SIJ status affects his deportability.  As a result, the Court turns next to the jurisdiction stripping provision contained in 8 U.S.C. § 1252.

### C.   Statutes Provide Limited Judicial Review in Immigration Proceedings

Before the INA's enactment in 1952, habeas corpus provided the vehicle through which aliens could ask federal district courts to review their deportation orders.  In 1961, Congress amended the INA to provide for appeal of deportation orders directly to the United States courts of appeals, leaving district courts limited ability to review such orders in habeas proceedings. David M. McConnell, *Judicial Review Under the Immigration and Nationality Act: Habeas Corpus and the Coming of Real Id (1996-2005)*, 51 N.Y.L. Sch. L. Rev. 75, 80 (2007) (hereinafter "Judicial Review").  For the next thirty-five years, this regime remained in place until Congress enacted major immigration reform in 1996.  Through the Antiterrorism and Effective Death Penalty Act of 1996, commonly known as AEDPA, and the Illegal Immigration

---

[23] In the criminal context, the United States Court of Appeals for the Fifth Circuit found that SIJ status excluded a defendant from criminal liability under 18 U.S.C. § 922(g)(5)(A) because he was not "illegally or unlawfully in the United States" at the time of his arrest. *Garcia*, 707 F. App'x at 235.  Although limited case law exists regarding SIJ status, courts uniformly recognize that the congressional intent behind the SIJ statute is to protect vulnerable juvenile immigrants from harm. *See, e.g.*, *Zheng v. Pogash*, 416 F. Supp. 2d 550, 554 n.5 (S.D. Tex. 2006) (reflecting that Congress made legislative changes to the SIJ statute to ensure it "was meant only for minors who truly are in need of protection from abuse, neglect or abandonment").

Reform and Immigrant Responsibility Act of 1996, referred to in this memorandum opinion as

IIRIRA, Congress sought to restrict judicial review of certain aliens and immigration claims.

After the 1996 amendments,

> INA section 106(a) set forth the 'sole and exclusive' procedure for judicial review
> of deportation orders. Under section 106(a), most aliens had 90 days after entry
> of a final administrative deportation order to seek judicial review by filing a
> review petition in the court of appeals for the judicial circuit in which deportation
> proceedings took place, or in the circuit in which the alien resided.[24]

McConnell, *Judicial Review*, 51 N.Y.L. Sch. L. Rev. at 81. In so doing, the 1996 amendments

raised questions regarding whether Congress had stripped federal district courts of jurisdiction to

review habeas corpus petitions concerning challenges to removal orders, and courts ultimately

differed in their answers.

In 1999, the United States Court of Appeals for the Fourth Circuit issued two opinions

about this jurisdictional bar. In *Mapoy v. Carroll*, one of the primary cases on which

---

[24] As aptly summarized in McConnell's law review article, the 1996 amendments to the INA generally allow only one challenge to an order of removal to streamline and expedite judicial review for all immigrants:

> The procedural requirements for judicial review of removal orders are set forth in
> INA section 242. Only administratively "final" orders are reviewable. All non-
> citizens seeking review of their removal orders must comply with the following
> requirements: 1) a 30-day time limit for seeking review; 2) venue is exclusively in
> the court of appeals where the immigration judge completed the proceedings; 3)
> the respondent is the Attorney General, and the petition must be served on the
> Attorney General and the Field Office Director for Immigration and Customs
> Enforcement, Department of Homeland Security; 4) service of the petition does
> not stay removal for any alien; all petitioners must file a motion with the
> appropriate court of appeals in order to obtain a stay of removal pending judicial
> review; 5) the petitioner's brief must be filed no later than 40 days after the
> administrative record is available, and a reply brief must be filed no later than 14
> days after the Attorney General's brief is filed; 6) the petitioner must attach a
> copy of the order and state whether any other court has upheld the validity of the
> order; 7) no petitioner may seek review unless he or she has exhausted all
> administrative remedies.

McConnell, *Judicial Review*, 51 N.Y.L. Sch. L. Rev. at 85.

Respondents rely in their Motion to Dismiss, the Fourth Circuit held that the amendments stripped district courts of jurisdiction because requests to stay removal generally fall within § 1252(g)'s jurisdictional bar.  185 F.3d 224, 230 (4th Cir. 1999) ("Congress could hardly have been more clear and unequivocal that courts shall not have subject matter jurisdiction over claims arising from the actions of the Attorney General enumerated in § 1252(g) other than jurisdiction that is specifically provided by § 1252.").  That same year, the Fourth Circuit held in *Bowrin v. Immigration and Naturalization Service* that federal district courts retained jurisdiction despite § 1252(g) to address "questions of pure law" through § 2241 proceedings.  194 F.3d 483, 490 (4th Cir. 1999).

Two years later, the Supreme Court resolved any dispute when it held in *Immigration and Naturalization Service v. St. Cyr* that the 1996 amendments had not stripped the courts of habeas jurisdiction to review a question of law pertaining to whether certain statutorily provided discretionary relief was available for a removable alien.  533 U.S. 289 (2001).  Because the INA, as amended in 1996, did not clearly foreclose habeas review, and because foreclosure would raise serious constitutional questions with respect to the suspension of habeas corpus, the Supreme Court construed the statute as allowing review.  *Id.* at 314.  In a footnote, the Supreme Court added:  "As to the question of timing and congruent means of review, we note that Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals."  *Id.* at 314 n. 38.  Accordingly, the Supreme Court's resolution of the habeas corpus issue was that, at a minimum, habeas corpus jurisdiction remained in the district court for criminal aliens raising "pure" questions of law relating to discretionary relief that could not be heard in the court of appeals on direct review.  *Id.*

1.      **The REAL ID Act's Jurisdiction-Stripping Provision Funnels
        Challenges of Removal to Courts of Appeals**

After the Supreme Court's decision in *St. Cyr*, Congress overhauled the judicial review

scheme through the REAL ID Act.  Enacted in 2005, the REAL ID Act "amended section

242(a)(2) of the INA to eliminate habeas corpus jurisdiction [in district courts] over removal

orders for any alien. Thus, section 106 of the REAL ID Act responded directly to the Supreme

Court's decision in *St. Cyr* by expressly removing habeas jurisdiction."  McConnell, *Judicial

Review*, 51 N.Y.L. Sch. L. Rev. at 105.  INA § 242 now requires that an appeal of a removal

order be filed directly with the courts of appeals through a petition for review.  8 U.S.C.

§ 1252(a)(1).

Notably, the REAL ID Act added § 242(a)(5) to the INA, codified at 8 U.S.C.

§ 1252(a)(5), which states that:

> Notwithstanding any other provision of law (statutory or nonstatutory), including
> section 2241 of title 28, United States Code [28 U.S.C. § 2241], or any other
> habeas corpus provision, and sections 1361 and 1651 of such title [28 U.S.C.S.
> §§ 1361 and 1651], a petition for review filed with an appropriate court of appeals
> in accordance with this section shall be the sole and exclusive means for judicial
> review of an order of removal entered or issued under any provision of this Act,
> except as provided in subsection (e) of this section. For purposes of this Act, in
> every provision that limits or eliminates judicial review or jurisdiction to review,
> the terms "judicial review" and "jurisdiction to review" include habeas corpus
> review pursuant to section 2241 of title 28, United States Code, [28 U.S.C.
> § 2241] or any other habeas corpus provision, sections 1361 and 1651 of such title
> [28 U.S.C. §§ 1361 and 1651], and review pursuant to any other provision of law
> (statutory or nonstatutory).

8 U.S.C. § 1252(a)(5).

In the REAL ID Act, Congress also amended INA § 242(b)(9), codified at 8 U.S.C.

§ 1252(b)(9), to reinforce its "channeling" of constitutional and statutory claims to the circuit

courts.  That section now provides that:

> Judicial review of all questions of law and fact, including interpretation and

application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, United States Code, or any other habeas corpus provision, by sections 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).

Additionally, Congress amended INA § 242(g), codified at 8 U.S.C. § 1252(g), to address the potential for claims being raised in other courts.  That section now provides:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, by sections 1361 or 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g).

Accordingly, the REAL ID Act forecloses nearly all habeas claims from those seeking review of removal orders, shifting work from the federal district courts to the court of appeals and from habeas to petitions for review.  *Jahed v. Acri*, 468 F.3d 230, 233 (4th Cir. 2006); *see also Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 324 n.3 (2d Cir. 2006) ("a primary effect of the REAL ID Act . . . is to convert habeas corpus petitions filed by criminal aliens seeking review of their removal orders into petitions for review in order to limit all aliens to one bite of the apple . . .  [and thereby] streamline what the Congress saw as uncertain and piecemeal review of orders of removal, divided between the district courts (habeas corpus) and the courts of appeals (petitions for review)").  "The plain language of these amendments, in effect, strips the district court of habeas jurisdiction over final orders of removal, including orders issued prior to the enactment of REAL ID Act." *Ishak v. Gonzales*, 422 F.3d 22, 29 (1st Cir. 2005).

2.    **After the REAL ID Act, Courts of Appeals Generally May Review Constitutional Questions and Questions of Law, But Respondents Argue This Court Does Not Have Jurisdiction To Do So Here**

Following enactment of the REAL ID Act, constitutional questions and questions of law that arise in the context of a claim for cancellation of removal are generally only reviewable by courts of appeals.  *Jean v. Gonzales*, 435 F.3d 475, 480 (4th Cir. 2006) (observing that the REAL ID Act limits direct judicial review in the court of appeals to "constitutional questions or questions of law arising from the agency's decision to deny discretionary relief"); *see also Kporlor v. Holder*, 597 F.3d 222, 226 (4th Cir. 2010) (noting statutory exception to § 1252(a)(2)(C), added as part of the 2005 REAL ID Act and codified in 8 U.S.C. § 1252(a)(2)(D), that covers only claims raising constitutional or legal issues).  The statute makes clear that federal district courts remain limited in their ability to review habeas petitions challenging removal orders.

Here, Respondents contend that "federal courts have no jurisdiction over any claim or cause arising from the Attorney General's decision in commencing proceedings, adjudicating cases, or executing removal orders."  (Mem. Supp. Mot. Dismiss 6 (citations omitted)).  Because Joshua's § 2241 Petition "seeks a stay of removal pending the BIA's review of the [Immigration Judge's] order denying his motion to reopen," Respondents argue that 8 U.S.C. § 1252(g) divests this Court of jurisdiction.  (*Id.* 7.)   Respondents state that "*Mapoy* controls here, and the Court should follow it—and other courts—and find that because the Petition seeks to stay removal, it arises from the decision to execute a removal order and thus § 1252(g) bars jurisdiction." (*Id.* 11.)  Respondents further argue that 8 U.S.C. § 1252(g) bars jurisdiction over statutory and constitutional claims.

As to Joshua's invocation of the Suspension Clause, Respondents contend that § 1252(g)'s jurisdictional bar does not violate that Clause because (1) Joshua is not seeking habeas relief because he does not request release from custody; and, (2) "even if the Suspension Clause applied, Joshua has adequate and effective substitute procedures available:  the motion to reopen and BIA appeal administrative process followed by courts of appeals review."  (*Id.* 12.)  To resolve Respondents' Motion to Dismiss, the Court turns next to the writ of habeas corpus and the Suspension Clause.

### D.     The Writ of Habeas Corpus and the Suspension Clause Can Allow Jurisdiction in a District Court Under Limited Circumstances Which Exist Here

Joshua bases his habeas corpus petition on 28 U.S.C. § 2241, which broadly grants federal courts the power to award habeas corpus relief to petitioners who are in custody in violation of federal law.  Respondents aver that this writ is not available to Joshua under § 1252(g).  To resolve this dispute, the Court undertakes the following three steps.  First, the Court must determine whether Joshua's claims fall within the scope of § 2241 habeas corpus review.  If so, the Court must then determine whether Joshua may invoke the Suspension Clause.  If Joshua may invoke the Suspension Clause, the Court must decide whether the administrative remedies available to Joshua to test the lawfulness of the government's proposed action are either inadequate or ineffective as a substitute for habeas corpus relief.

### 1.     The Court finds that Joshua's Claims Fall Within the Scope of § 2241 Habeas Corpus Review

Habeas corpus is "a writ employed to bring a person before a court, most frequently to ensure that the party's imprisonment or detention is not illegal."  *Boumediene v. Bush*, 553 U.S. 723, 737 (2008) (quoting Black's Law Dictionary 728 (8th ed. 2004)).  The Court does not find persuasive Respondents' argument that Joshua's claims do not fall within the scope of § 2241—

the statute which Joshua relies on for relief—because he "does not seek relief from custody."
(Mem. Supp. Mot. Dismiss 13.)  It is true that petitioners invoking the writ of habeas corpus
often seek relief from custody, but as the Fourth Circuit has recently explained, § 2241 "provides
that habeas corpus relief can extend to several classes of persons, including those 'in custody
under or by color of the authority of the United States' and those 'in custody in violation of the
Constitution or laws or treaties of the United States.'"  *D.B. v. Cardall*, 826 F.3d 721, 731 (4th
Cir. 2016) (quoting 28 U.S.C. § 2241(c)(1), (3)).

The Supreme Court has similarly explained that § 2241, the statute invoked here,
"implements the constitutional command that the writ of habeas corpus be made available . . . to
test the legality of a given restraint on liberty."  *Jones v. Cunningham*, 371 U.S. 236, 238 (1963);
*see also Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (concluding that "habeas corpus
proceedings remain available as a forum for statutory and constitutional challenges to post-
removal-period detention").

Joshua asserts in his § 2241 Petition that his detention and pending removal violate
federal statutes and the Constitution.  Because Joshua seeks relief that may alter the fact or
execution of his detention and such detention presents a clear restraint on his liberty, habeas
presents the appropriate procedural vehicle for him to employ.  His contentions, which rest on
violations of federal law and the Constitution, "therefore fall within the traditional scope of
§ 2241 habeas corpus review."  *D.B. v. Cardall*, 826 F.3d at 731.

### 2. <u>Courts Follow a Two-Step Inquiry to Invoke the Suspension Clause</u>

As explained above, through the enactment of the REAL ID Act, Congress has stripped
Article III courts of jurisdiction over many types of immigration disputes and instead channeled
those disputes into administrative proceedings.  *See Higuit v. Gonzales*, 433 F.3d 417, 420 (4th

Cir. 2006) ("[T]he REAL ID Act reflects a congressional intent to preserve [a] broad effort to streamline immigration proceedings and to expedite removal while restoring judicial review of constitutional and legal issues.").  Specifically, two jurisdiction-stripping provisions potentially apply in this case.  The first, 8 U.S.C. § 1252(b)(9), provides that "judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States  . . . shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).  The statute then deprives district courts of jurisdiction to review such orders, leaving an appeal to the court of appeals from a final agency order as the only form of judicial review.  The second provision, 8 U.S.C. § 1252(g), strips district courts of jurisdiction "to hear any case or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  8 U.S.C. § 1252(g).

The writ of habeas corpus, however, may not be easily extinguished through statute.  The "great writ of liberty," *Darr v. Burford*, 339 U.S. 200, 225 (1950) (Frankfurter, J., dissenting), is "the only common-law writ to be explicitly mentioned" in the Constitution.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 558 (2004) (Scalia, J., dissenting) (citing U.S. CONST. ART. I, § 9, cl. 2.).  The Suspension Clause forbids suspension of the writ of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it."[25]  U.S. CONST. ART. I, § 9, cl. 2.  "The

---

[25] The Court observes that the Supreme Court will hear oral argument on March 2, 2020, in *Department of Homeland Security v. Thuraissigiam* to determine whether, as applied to the petitioner, 8 U.S.C. § 1252(e)(2) is unconstitutional under the Suspension Clause.  In that case, the Ninth Circuit concluded

that § 1252(e)(2) violates the Suspension Clause as applied to Thuraissigiam, although we do not profess to decide in this opinion what right or rights Thuraissigiam may vindicate via use of the writ.  The district court has jurisdiction and, on remand, should exercise that jurisdiction to consider

Clause protects the rights of the detained by a means consistent with the essential design of the Constitution.  It ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene*, 553 U.S. at 745.  Because of the Suspension Clause, the Constitution "unquestionably" requires some "judicial intervention in deportation cases." *St. Cyr*, 533 U.S. at 300.

To determine whether a jurisdiction-stripping statute violates the Suspension Clause, the Court must proceed through the two-step analysis that the Supreme Court announced in *Boumediene v. Bush*.  553 U.S. at 739.  "[This Court must] first determine whether a given habeas petitioner is prohibited from invoking the Suspension Clause due to some attribute of the petitioner or to the circumstances surrounding his arrest or detention." *Osorio-Martinez*, 893 F.3d at 166 (internal quotation marks and citations omitted).  "Then, if the petitioner is not prohibited from invoking the Suspension Clause, [this Court must] turn to the question whether the substitute for habeas is adequate and effective to test the legality of the petitioner's detention (or removal)." *Id.*  "[T]he substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus." *Swain v. Pressley*, 430 U.S. 372, 381 (1977).  Conversely, however, a statute may violate the Suspension Clause where habeas corpus relief is foreclosed and alternative

---

Thuraissigiam's legal challenges to the procedures leading to his expedited removal order.

*Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1119 (9th Cir.), *cert. granted sub nom. Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 427 (2019).  Although *Thuraissigiam* addresses different statutory provisions, the Supreme Court's decision in that case may provide further guidance on the invocation of the Suspension Clause in immigration proceedings.

remedies are inadequate to ensure that the petitioner's continued detention does not violate federal law.  *See Boumediene*, 553 U.S. at 792.

### V.  Analysis:  The Court Will Assume Jurisdiction In This Unusual Circumstance

After completing the two-step *Boumediene* inquiry, the Court concludes that at this stage of the litigation, when considering Respondents' Motion to Dismiss, Joshua has alleged facts sufficient to invoke the Suspension Clause.  *See Upstate Forever, L.P.*, 887 F.3d at 645–46 ("A court's determination of subject matter jurisdiction addresses whether the court has the authority to entertain a particular kind of case, not whether a claim for relief is viable under a particular construction of a statute.").  As a result, for the reasons discussed below, the Court will assume jurisdiction over the § 2241 Petition and deny Respondents' Motion to Dismiss.

### A.        Joshua May Invoke the Suspension Clause

Turning to the first *Boumediene* inquiry, the Court concludes that Joshua is not prohibited from invoking the Suspension Clause given the circumstances of his detention.[26]  The Supreme Court has set forth three relevant factors to evaluate whether a petitioner is prohibited from invoking the Suspension Clause:  "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ."  *Boumediene*, 553 U.S. at 766.

As to the first factor—his citizenship and status—although Joshua is not a citizen, he has received a special immigration status in accordance with the SIJ statutes.  Joshua's SIJ status includes statutory and constitutional protections.  As the Third Circuit has explained, "[t]hat is

---

[26] Respondents do not discuss or dispute these factors as applied to Joshua and the circumstances of his detention.  Rather, Respondents focus their argument on the second *Boumediene* inquiry, whether he has an adequate alternative to habeas.

because. . .  (1) [Joshua has] satisfied rigorous eligibility criteria for SIJ status, denoting [him] as [a] ward of the state with obvious implications for [his] relationship to the United States; (2) Congress accorded [such] children a range of statutory and procedural protections that establish a substantial legal relationship with the United States; (3) with [his] eligibility for application for permanent residence assured and [his] application awaiting only the availability of [a] visa . . .  and the approval of the Attorney General, [Joshua has] more than "beg[un] to develop the ties that go with permanent residence, and (4) . . . SIJ designees' connection to the United States is consistent with the exercise of Congress's plenary power."  *Osorio-Martinez*, 893 F.3d at 168; *see also J.L. v. Cissna*, 374 F. Supp. 3d 855, 869 (N.D. Cal. 2019) ("Plaintiffs have plausibly alleged that they have a protected property interest in SIJ status.").

Here, Joshua alleges that he has developed ties to the United States, having lived here for five years without incident.  Apart from two traffic infractions, he has no criminal history.  His connections, bolstered through his SIJ status, are sufficient to establish Joshua within the "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  His Uncle Credy is his legal guardian. Additionally, his SIJ status inherently recognizes that he is a ward of the United States with the approval of both state and federal authorities.  His SIJ status puts this case in a unique procedural posture given the Congressional protections provided to young immigrations through the enactment of the SIJ statutes.

As to the second factor—the nature and the site of his apprehension and detention— Joshua was detained in the United States for two minor traffic offenses:  speeding and driving without a license.  As to the third factor—practical obstacles to resolving the writ—there are no

serious practical obstacles to permitting habeas corpus proceedings other than the kind of

"incremental expenditure of resources" that the Supreme Court deemed not dispositive to the

question of granting the writ.  *Boumediene*, 553 U.S. at 769.  Joshua readily meets the three

*Boumediene* factors.  Consequently, Joshua appears entitled to constitutional protections,

including those provided by the Suspension Clause.

**B.     Joshua Does Not Have Adequate Alternatives to a Habeas Petition**

Turning to the second *Boumediene* inquiry, whether the substitute for habeas is adequate

and effective to test the legality of the petitioner's detention (or removal), the Court concludes

that, taking the allegations in Joshua's § 2241 Petition as true, adequate alternatives to a habeas

petition do not exist.  As a result, the Court must deny Respondent's 12(b)(1) Motion to Dismiss,

which asserts that Joshua's petition fails to state a claim upon which subject-matter jurisdiction

can lie.

For this subsection of the analysis, Respondents contend that § 1252(g)'s jurisdictional

bar does not violate the Suspension Clause because Joshua may pursue "his motion to reopen his

removal proceedings even after his removal and can ultimately petition for review in the

applicable court of appeals, including constitutional claims and questions of law, for any BIA

denial of his motion to reopen."  (Mem. Supp. Mot. Dismiss 14.)  Respondents further assert that

Joshua's SIJ status does not change this calculus because the question "is not whether [Joshua]

has a liberty interest or will lose any benefits of his SIJ status.  The question is instead whether

the motion to reopen administrative review process followed by court of appeals review is an

adequate and effective substitute for habeas."  (*Id.* 18.)

In response, Joshua argues that "[d]eporting Joshua eliminates his path to lawfully pursue

full status and is a deprivation of his constitutional rights."  (Opp'n Mot. Dismiss 1, ECF No.

25.)  Because removal outside of the United States would strip Joshua of his SIJ status, rights he claims he can never regain if removed, Joshua asserts that appealing through the BIA does not provide an adequate alternative to habeas.  "Furthermore, it is far from clear that Joshua would actually be able to access the benefits of SIJ status after removal and re-entry, even if the BIA appeal is ultimately sustained." (*Id.* 12.)  Joshua also states that the threats to his life in Honduras and the danger he faces there will make it difficult to pursue his appeal from that country.

To determine whether the administrative review process provides an adequate and effective substitute for habeas, the Court first reviews the procedures available to Joshua and then turns to the factual allegations in his § 2241 Petition.

### 1.     Generally, Motions to Reopen Immigration Proceedings Can Be Pursued from Abroad

The motion to reopen is an "important safeguard" intended "to ensure a proper and lawful disposition" of immigration proceedings. *Kucana v. Holder*, 558 U.S. 233, 242 (2010).  The filing of a motion to reopen in the BIA does not automatically stay proceedings.  8 C.F.R. § 1003.2(f).  An alien, however, may request an emergency stay of removal.  *See* BIA Practice Manual §§ 6.4(b), 6.4(d)(i), 1999 WL 33435431 at *2–3.  An emergency stay request is discretionary and "may be submitted only when an alien is in physical custody and is facing imminent removal."  BIA Practice Manual § 6.4(d)(i), 1999 WL 33435431 at *3.

Further, because judicial review in the court of appeals is "available only in judicial review of a final order," an alien may not appeal the denial of an emergency motion to stay. 8 U.S.C. § 1252(b)(9).  For the same reason, an alien cannot file with the court of appeals a motion to stay pending the BIA's disposition of a motion to reopen.  In other words, whether an alien files an emergency motion to stay with the BIA, and whether the BIA acts on such a

motion, the court of appeals lacks jurisdiction to entertain a request to stay in connection with a motion to reopen pending before the BIA.  In any event, the United States might deport an immigrant, like Joshua, while he or she awaits a hearing and decision on the motion to reopen.  8 C.F.R. §§ 1003.2(f); 1003.23(b)(4)(i); *see also Sied v. Nielsen*, 2018 WL 1142202 at \*7–\*8 (N.D. Cal. Mar. 2, 2018) (explaining that no procedure or automatic mechanism exists to prevent the government from deporting the alien before the immigration judge decides the stay motion or motion to reopen).

In general, courts recognize that a petition for review can be pursued from abroad.  *See generally Nken v. Holder*, 556 U.S. 418, 435 (2009); *Ashqar v. Hott*, No. 1:19-CV-716, 2019 WL 2712276, at \*5 (E.D. Va. June 5, 2019) (stating that "petitioner may continue to pursue from abroad an appeal of the Immigration Court's denial of his motion to reopen").  Such a process normally provides an adequate alternative to habeas where the petitioner can pursue his or her appeal from outside the United States.  For example, in *Budiono v. Barr*, the district court found that because the petitioner could pursue a motion to reopen from abroad, he had an adequate alternative to habeas relief.  No. 4:19-CV-01635, 2019 WL 5569182, at \*6 (M.D. Pa. Oct. 29, 2019).  In that case, the district court noted that the record lacked any "indication of a specific threat to Budiono."  *Id.*  Once he returned to his native country, Budiono did not need to hide away in his home, he could travel freely, and contact the outside world, meaning he could "effectively pursue a motion to reopen from Indonesia." *Budiono*, at \*6.  As a result, the district court concluded that it lacked jurisdiction to stay Budiono's removal because he had an adequate alternative to habeas relief:  pursuing his appeal from overseas.

While the administrative process followed by courts of appeals review generally satisfies the Suspension Clause, the Court must examine whether it does so considering the facts (taken as

true), that Joshua alleges in his § 2241 Petition.  (*See* § 2241. Pet. 10 (specifying 8 U.S.C.

§ 1252(g) unconstitutional as applied to Joshua)).

### 2.    Joshua Does Not Have Adequate Administrative Review Because He Would Lose His SIJ Status if Removed to Honduras

In accordance with the second *Boumediene* step for determining whether revocation of

habeas jurisdiction violates the Suspension Clause, the Court finds that under the facts alleged

Joshua does not have an adequate alternative to habeas.[27]

Although the jurisdiction-stripping provisions of § 1252 do not *facially* run afoul of the

Suspension Clause, the Court finds the alternative administrative remedy inadequate under the

*circumstances of this case*.  Three important facts differentiate Joshua's § 2241 Petition from

others.  First, apart from two minor traffic infractions, Joshua has no criminal history, though he

has been detained in Farmville for twelve months.  Second, Joshua has asserted—with

supporting documentation—that he will be unable to litigate this motion to reopen upon

returning to his country due to the dangerous conditions that he faces in Honduras.  The Court

takes as true that Joshua has received specific threats to his life should he return to Honduras,

which Respondents do not dispute, and he bears physical scars reflecting the violence he suffered

there.  The Honduran gangs also continued to threaten Joshua in Honduras, even after he and his

aunt relocated to Trujillo.

Third, and most critically, Joshua has received SIJ status and does not have an alternative

method of preserving that status should he be removed from the United States.  *See also*

*Boumediene*, 553 U.S. at 781 ("The idea that the necessary scope of habeas review in part

---

[27] Respondents challenge this Court's subject matter jurisdiction pursuant to Rule 12(b)(1).  But, in accordance with the Court's finding that Joshua may invoke the Suspension Clause, the analysis for the Suspension Clause requires that Court to examine whether § 1252(g) unconstitutionally strips jurisdiction from this Court as applied to the facts alleged in Joshua's § 2241 Petition.

depends upon the rigor of any earlier proceedings accords with our test for procedural adequacy in the due process context."). The plain language in the SIJ statute and the I-485 application process require Joshua to have a physical presence in this country. *See* 8 U.S.C. § 1101(a)(27)(J) ("an immigrant who is present in the United States"). No guarantees exist that Joshua could preserve or revive his SIJ status should he be removed from the United States. Indeed, the only authority Respondents provide to assure the Court that Joshua could maintain his SIJ status benefits come from a FAQ section on the USCIS website. Respondents do not identify any statute, policy, or manual that spoke to whether a person with SIJ status could maintain that classification once deported. Joshua's SIJ status provides him statutory rights that make this case unique and further illustrates why the administrative process and court of appeals review do not provide an adequate alternative to habeas relief.

In the few cases with comparable facts, district courts have recognized a narrow, as-applied exception to the § 1252(g) bar. For example, in *Diaz-Amezcua v. Barr*, the district court denied the Government's motion to dismiss for lack of jurisdiction after finding that petitioner sufficiently alleged that he would be unable to pursue his motion to reopen from Mexico. 402 F. Supp. 3d 963, 967 (W.D. Wash. 2019). In that case, petitioner asserted that his cousin had been shot as part of an ongoing gang feud involving his extended family and that he "would be a target in that feud if returned to Mexico." *Diaz-Amezcua*, 402 F. Supp. 3d at 96.

Similarly, in *Sean B. v. McAleenan*, the district court concluded that alternatives to habeas relief were inadequate because the petitioner could not litigate an immigration or appeal in the BIA or the Court of Appeals "in hiding, under a threat of death." 2019 WL 4165309, at *12 (D.N.J. Sept. 3, 2019) ("Not to put too fine a point on it, the death threats, if carried out, would moot and defeat the review process."). In that case, the petitioner had testified against a

violent drug trafficking organization in Jamaica. After he provided testimony against that organization, he had been threatened directly, "his sister's house was burned down, the house of his children's mother was bombed, six of his cousins have been murdered, and his father was forced to flee the country." *Sean B.*, 2019 WL 4165309, at *4. Thus, the district court found that § 1252(g), as applied, violated the Suspension Clause because the petitioner would not be able to effectively pursue his appeal from abroad.

These two courts are not alone in concluding that, as applied, § 1252(g) violates the Suspension Clause in certain circumstances. *See Compere v. Nielsen*, 358 F. Supp. 3d 170, 173, 179 (D.N.H. 2019) (holding that § 1252(g) does not violate the Suspension Clause where a noncitizen can continue to litigate motion to reopen after removal, but that the petitioner would be unable to litigate his motion to reopen if he were removed to Haiti, and therefore the Suspension Clause prevented § 1252(g) from stripping district court of habeas jurisdiction); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 294 (D. Mass. 2018) (holding that the BIA's processes for adjudicating motions to reopen and motions to stay were not adequate alternatives to habeas for the petitioners, who sought to file motions to reopen based on changed conditions in Indonesia that occurred after their original removal orders were entered); *Ibrahim v. Acosta*, 2018 WL 582520, at *5–*6 (S.D. Fla. Jan. 26, 2018) (granting habeas petition for stay of removal to class of Somali nationals facing imminent removal, concluding that § 1252(g) "violates the Suspension Clause as applied if it deprives Petitioners of a meaningful opportunity to exercise their statutory right to file motions to reopen their immigration cases," and finding that the petitioners would not be able to effectively pursue motions to reopen from Somalia where they likely would be forced underground to avoid persecution); *Sied v. Nielsen*, No. 17-06785, 2018 WL 1142202, at *25 (N.D. Cal. Mar. 2, 2018) (holding that the motion-to-reopen

process "is not a constitutionally adequate substitute process in the facts of this case, where the government can manipulate the process by deporting Mr. Sied before he can be heard, to a country [Eritrea] where he may be tortured or killed").

This Court likewise concludes that, as applied to Joshua, § 1252(g) violates the Suspension Clause.  After receiving his SIJ status, Joshua filed a motion to reopen in the immigration court.  The immigration court denied his motion to reopen and Joshua appealed to the BIA.  As Respondents confirmed at the December 10, 2019 status hearing, Joshua would have been removed from the United States absent this Court's order temporarily staying his removal.  Had Joshua been removed, he would have needed to try and pursue his appeal from Honduras.  And as the record shows, Joshua would likely have received threats of violence or suffered physical harm upon his return there.  Moreover, the New York Family Court[28] and USCIS, through awarding him SIJ status, have found that returning to Honduras is not in Joshua's best interest.

Critically, Respondents cite no legal authority to assure that removal would not deprive Joshua of his SIJ status.  Respondents provide no case law, statute, or regulation to rebut the plain language of the statute that provides SIJ status is available only for persons "*present in the United States*."  8 U.S.C. § 1101(27)(a)(J).  Because Joshua does not have an adequate alternative remedy to challenge his removal—as the removal process may inherently jettison his SIJ status for lack of presence in the United States and subject him to violence in Honduras— Joshua's habeas petition invokes the Suspension Clause.

Here, the Court takes into consideration at the Motion to Dismiss stage both the danger Joshua faces should he return to Honduras and the potential loss of his SIJ status and ability to

---

[28]  The New York Family Court explicitly found that "[g]ang members have sworn to kill Joshua should he return to Honduras."  (§ 2241 Pet., Ex. 1 Ct. Or. 2.)

seek adjustment of status in the United States. The risks to his life would deprive him of the opportunity to pursue his appeal from abroad. Although Respondents contend that Joshua does not face "country-wide threats or persecution," meaning that he may be able to find a safe location somewhere in Honduras to pursue his appeal, the Court does not find this argument persuasive.[29] *See, e.g.*, *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 830 (7th Cir. 2016) (stating that "evidence about generalized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country"). The facts as alleged indicate that Joshua received specific threats and suffered multiple injuries to his person while in Honduras. The Court need only accept these allegations as true and draw all inferences in Joshua's favor. *Kerns*, 585 F.3d at 192.

The Court recognizes that this outcome rests on the preliminary procedural posture it faces. To be sure, the Court sees that when Congress stripped the district courts of jurisdiction § 1252(g) to grant habeas relief, it provided aliens with an alternative method to challenge the legality of removal orders: a motion to reopen followed by a petition for review filed in a court of appeals. *See* 8 U.S.C. § 1252(a)(5), (2)(D). Thus, in general, the Courts of Appeals have rejected Suspension Clause challenges on the ground that a motion to reopen plus a petition for review in the court of appeals would be an adequate substitute for habeas corpus. *See, e.g.*, *Iasu*

---

[29] Respondents cite *Mejia v. Sessions*, 866 F.3d 579, to argue that Joshua has not alleged he faces country-wide danger should he return to Honduras, and therefore his invocation of the Suspension Clause fails. The Court finds Respondents' reliance on *Mejia* unavailing, as that case does not address the legal implications of removing an individual with SIJ status. *See Mejia*, 866 F.3d 560 (addressing whether 8 U.S.C. § 1231(a)(5) precludes individuals subject to reinstated removal orders from applying for asylum). Also, at this stage, the parties do not dispute that Joshua experienced physical gang violence in two different Honduran cities before arriving in the United States. Although Respondents argue that these allegations fall short of asserting country-wide danger, it seems precarious to return Joshua to a country in which he has experienced violence in two cities hundreds of miles apart. More likely than not, if removed to Honduras Joshua would face significant obstacles to effectively litigating his case and retaining his SIJ status.

*v. Smith*, 511 F.3d 881, 893 (9th Cir. 2007) (rejecting as-applied challenge); *Mohamed v. Gonzales*, 477 F.3d 522, 526 (8th Cir. 2007) (same); *Alexandre v. U.S. Att'y Gen.*, 452 F.3d 1204, 1206 (11th Cir. 2006) (per curiam) (rejecting facial challenge).

But that is not the question raised here. The Court concludes, under these unusual circumstances—involving a person with SIJ status, stemming in part from the *RFM* class action lawsuit, who has no meaningful criminal history and who faces specific threats should he return to Honduras—the alternative remedy to litigate from abroad does not provide an adequate substitute for habeas. Joshua therefore satisfies the second *Boumediene* inquiry and the Court may exercise subject matter jurisdiction over his § 2241 Petition.

## VI.  Stay of Removal

Finally, having found that the Court possesses jurisdiction, the Court must determine whether to extend the temporary stay given to Joshua's motion for a temporary restraining order and the issues raised in his § 2241 Petition. (*See* Mot. Temporary Restraining Or., ECF No. 5.) The Court concludes that the circumstances of this case, particularly considering Joshua's SIJ status, warrant a stay.[30]

"A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case."[31] *Nken v. Holder*, 556 U.S. 418, 433 (2009). The party

---

[30]  Case law often confuses "stay" and "injunction." While there is substantial overlap between the four factors required for granting a stay and the factors governing preliminary injunctions, *see Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), this is so because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[31]  In response to the Motion to Dismiss, Counsel for Joshua states that the Solicitor General made inaccurate representations to the *Nken* Court regarding the government's policies

requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.  *Id. at* 433–34.  Under the traditional standard for determining whether a stay applies, the Court must consider four factors:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Id*. at 425–26.  In the immigration context, the first two factors are the "most critical" for cases concerning removal.  *Nken*, 556 U.S. at 434.  And in the immigration context, where the Government is the non-moving party, the third and fourth factors generally "merge" into one.  *Nken*, 556 U.S. at 435.  Given that the Court has resolved invocation of the Suspension Clause in Joshua's favor, it turns now to the viability of Joshua's claims to evaluate the need, if any, for continuing the stay.

### A.    Joshua's Likelihood of Success on the Merits of His Claims Weighs in Favor of Extending the Stay

As to the first *Nken* requirement, the likelihood of success on the merits, the Court finds this factor satisfied.  In his § 2241 Petition, Joshua brings a Procedural Due Process Claim, an APA Claim, a Stay of Removal Claim, and a Suspension Clause Claim.  At this procedural posture, Joshua raises viable claims.

---

for returning individuals to the United States following removal.  (Opp'n 16, ECF No. 25.) Specifically, Counsel for Joshua observes that the Solicitor General, in an April 24, 2012 letter to the Supreme Court, acknowledged that declarations filed in the *Nken* litigation raised questions about the promptness and consistency with which returns had been accomplished.  (*Id*.)  As a result, Counsel for Joshua contends that "*Nken* is of little precedential value given that the government misrepresented significant facts that contributed to its findings."  (*Id.* 17.) Nevertheless, the stay factors set forth in *Nken* remain binding on this Court.

1. **Joshua States a Procedural Due Process Claim, Weighing Favorably Toward Extending the Stay**

Regarding Joshua's Procedural Due Process Claim, the Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. V.  In accordance with the Fifth Amendment, due process claims may have procedural and substantive components.  At its core, procedural due process guarantees the right to notice and an opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).  In contrast, "[t]he substantive component of due process bars certain government actions regardless of the fairness of the procedures used to implement them."  *D.B. v. Cardall*, 826 F.3d at 740 (internal quotations marks and citations omitted).

Unlike many other removal cases, Joshua has received a special legal status, his SIJ status, that he received in accordance with federal statutes.  This SIJ status reflects the determination of "Congress to accord those abused, neglected, and abandoned children a legal relationship with the United States and to ensure they are not stripped of the opportunity to retain and deepen that relationship without due process."  *Osorio-Martinez*, 893 F.3d at 170.  As discussed in *Osorio-Martinez*, Congress afforded these juvenile aliens a host of procedural rights designed to sustain their relationship to the United States and to ensure they would not be stripped of SIJ status protections without due process.  *See also D.B.*, 826 F.3d at 741–43 (discussing due process considerations raised in immigrant detention context when the government deprives a person of a protected liberty or property interest without adequate notice and a hearing).  Because SIJ status may constitute a protected liberty or property interest, and it may be revoked only for what the Secretary of Homeland Security deems "good and sufficient

64

cause," 8 U.S.C. § 1155; 8 C.F.R. § 205.2, at the very least Joshua raises a meritorious due process claim.

Also, the "good and sufficient cause" necessary to revoke Joshua's SIJ status does not appear on the record before the Court. And removal may likely cause Joshua to lose his SIJ status and the benefits such status confers because, once removed, he will no longer satisfy the plain language of the statutes as "an immigrant who is present in the United States." 8 U.S.C. § 1101(a)(27)(J). Moreover, stripping Joshua of his SIJ status, without "good and sufficient cause," appears to contravene the purpose of the SIJ statutes: establishing protection and a pathway to permanent residency for a specific subset of immigrant children. These considerations further weigh in favor of success on his due process claim.

Nor does the record show how Joshua could regain his SIJ status once removed. Because the SIJ statutes require that he remain within the United States, Joshua's removal would cut against the plain language of the statutes. And, if Joshua were to lose his SIJ status upon removal, it does not appear that he would be able to pursue adjustment of his status from SIJ to a lawful permanent resident because doing so requires physical presence within the United States. 8 U.S.C. § 1255(a).

### 2.      Joshua States an APA Claim, Weighing Favorably Toward Extending the Stay

In addition his Procedural Due Process Claim, Joshua raises an APA Claim, asserting that "ICE's sudden decision to prohibit some abused noncitizen youth from realizing the protections that Congress specifically enacted for them—a prohibition accomplished in this case by detaining, attempting to remove [Joshua] in the midst of his efforts to legalize his immigration status, and to render him statutorily ineligible for a form of relief he is currently eligible for—

improperly alters these substantive rules without notice-and-comment rulemaking, in violation of the APA." (§ 2241 Pet. 26.)

"[T]he APA authorizes a court to set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Perez*, 2020 WL 611530, at *5 (citing 5 U.S.C. § 706(2)(A)). To that end, "[t]he APA requires that all 'rules' be issued through a statutorily prescribed notice-and-comment process." *Children's Hosp. of the King's Daughters, Inc. v. Azar,* 896 F.3d 615, 619 (4th Cir. 2018) (citing 5 U.S.C. § 553(a)–(c)). The APA's notice and comment requirements apply only to "legislative" or "substantive" rules. *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) (citing 5 U.S.C. § 553(b)). The notice and comment procedures do not govern: (i) interpretative rules; (ii) general statements of policy; or, (iii) rules of agency organization, procedure, or practice. *Id.* (citing 5 U.S.C. § 553(b)). Failure to comply with the APA's notice and comment procedures renders a "legislative" or "substantive" rule invalid. *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 n.9 (4th Cir. 1995) (explaining that if the Attorney General promulgates a substantive interim rule "it would have been invalid from the date of its issuance for failure to comply with the notice [and comment] requirements under 5 U.S.C. § 553").

The Court finds that Joshua raises a claim whose likely success on the merits under the APA based on potentially arbitrary and capricious actions weighs in favor of extending the stay. Indeed, the Court finds it peculiar that the DHS grants Joshua relief pursuant to the SIJ statutes while another agency within DHS, Immigration and Customs Enforcement, simultaneously pursues removal. These seemingly opposing positions within the Executive Branch raise questions about the arbitrary and capricious nature of such actions. While the Court does not

resolve the APA claim at this juncture, it notes the inconsistencies between DHS' decision to grant Joshua SIJ status and to initiate his removal.

Additionally, the record does not make clear to the Court whether Respondents are acting pursuant to a policy or other agency guidance regarding the removal of individuals with SIJ status, a necessary consideration for Joshua's APA claim. If so, nothing on the record indicates, at this stage of the litigation, whether Respondents have adopted a policy or guidance in compliance with the APA. By way of comparison, in the *RFM* class action, the government defendants argued that no new policy existed when USCIS began unlawfully denying SIJ applications in contravention to the plain terms of the SIJ statute. *R.F.M.*, 365 F. Supp. 3d at 366. Although the *RFM* Court observed that no formal policy existed, that court recognized that "both parties agree[d] that prior to taking its new position regarding the New York Family Court, the USCIS regularly approved SIJ petitions made by juveniles who were between eighteen and twenty-one years of age when the Family Court issued a Special Findings Order, but that in early 2018 the agency began denying virtually all of these petitions." *Id.* As a result, the *RFM* court found that such action supported plaintiff's APA claim because the uniform denial of the SIJ applications constituted a new policy that contravened both state and federal law. *See generally R.F.M.*, 365 F. Supp. 3d at 380–82.

Given the incompatibility between removal with the statutory rights of SIJ designees, the Court finds this first *Nken* factor, probability of success, satisfied. Through the SIJ statutes, Congress granted individuals, like Joshua, certain rights, including eligibility to apply for adjustment to lawful permanent resident status, protection against having their SIJ status revoked without following the statutory process, and due process rights that attach to SIJ beneficiaries. The record also does not make clear what authority or guidance Respondents adhere to in this

instance, or whether such policy regarding the removal of individuals with SIJ status comports with the APA.  The first factor weighs in favor of extending the stay.

### B.      The Concern for Irreparable Harm Weighs in Favor of Extending the Stay

As to the second *Nken* requirement, irreparable harm, the Court also finds that this factor satisfied.  The parties do not dispute that Joshua's parents left him in Honduras as a two-year-old child.  The record shows that his lack of parental protection made him vulnerable to the members of a local gang, who began targeting Joshua.  While the United States characterizes the harm as not being "countrywide," the record shows that gang members slashed Joshua with knives and caused lasting hearing damage by launching a firecracker at his head.  Gang members continued to pursue Joshua after he moved to a different city in Honduras.  Joshua fled Honduras at age sixteen to escape the gang's death threats and after the gang killed one of his friends.

The New York Family Court found that it would not be in Joshua's best interest to return to Honduras "because he does not have an adequate and secure home" there and because "gang members have sworn to kill Joshua should he return."  *In re Joshua M.*, No. 212594 (N.Y. Fam. Ct. Bronx Cty., Jan. 23, 2019) (§ 2241 Pet.) (§ 2241 Pet., Ex. 1 Ct. Or. 2.)  By granting Joshua SIJ status, USCIS also found that Joshua should not return to Honduras.  In concert with those rulings, the record shows that Joshua faces likely irreparable physical harm should he return to Honduras.  The legal consequences that removal could carry for Joshua's pending appeal, his SIJ status, and any future applications for adjustment of status and admissibility also reinforce this finding.  Accordingly, the second factor, irreparable harm, weighs in favor of extending the stay.

### C.      The Balance of Equities Favors Extending the Stay

As to the third *Nken* requirement, the balance of the equities, the Court finds this factor weighs in favor of Joshua.  The significant irreparable harms that Joshua faces in the absence of

a stay outweigh any potential harm the United States may incur for this period.  The Court also observes that the dearth of case law on this issue could suggest that SIJ removal bas been uncommon in the past.  If true, this would undermine the urgency surrounding Joshua's removal.

Furthermore, by approving Joshua's SIJ application, USCIS recognized that Joshua has been abused, abandoned, or neglected by a parent and that it is not in his best interests to return to Honduras.  The Court finds that the third factor, the balance of the equities, weighs in favor of extending the stay.

### D.   Even Given the Public Interest in Prompt Removal, the Court Finds this Factor Favors Extending the Stay

As to the fourth and final *Nken* requirement, the public's interest, the Court finds this factor satisfied.  The Court recognizes that "[t]here is always a public interest in prompt execution of removal orders:  The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permits and prolongs a continuing violation of United States law."  *Nken*, 556 U.S. at 436.  But the Court also recognizes that there is a public interest in preventing immigrants from being wrongfully removed, particularly to countries where they are likely to face substantial harm.  *Id*.

For five years, Joshua has lived in the United States without incident until he was pulled over for speeding.  The vague (now year long) assertion that Joshua has a criminal history—on information and belief—because he is supposedly under investigation for sexual assault and threatening a police officer does not alter this Court's determination.  (Mem. Supp. Mot. Dismiss, Ex. A., Trump Decl. ¶¶ 13–15.)  Not only does an investigation fail to constitute a criminal history, it does not amount to a criminal *charge*, and carries no authority in these proceedings.  The circumstances of this case therefore weigh against the need for Joshua's prompt removal:  the record does not show that he is dangerous, he lacks meaningful criminal

convictions, and he has received SIJ status in accordance with federal statutes, through which Congress has recognized that a special subset of juvenile immigrants such as Joshua should not return to their native countries.  The Court finds that the fourth factor, the public's interest, weighs in favor of extending the stay.

Accordingly, the Court will stay Joshua's removal from the United States until June 30, 2020, to allow the parties time to fully brief and address the merits of Joshua's claims.  At that time, the Court will reevaluate the need for extending the stay considering the procedural posture of this case and any action that the BIA undertakes regarding Joshua's appeal.

## VII.  Procedure

### A.  Continued Injunction and Briefing

In his § 2241 Petition, Joshua contends that "the rushed efforts to remove him prior to the exhaustion of his lawful claims" violates the laws of the United States.  (§ 2241 Pet. 1.)  Joshua challenges the "process employed by [R]espondents" to remove him, asserting violations under the APA, the Fifth Amendment Due Process Clause, the Suspension Clause, and the INA.  But here, Respondents moved only to dismiss Joshua's § 2241 Petition pursuant to Rule 12(b)(1), asserting that, even accepting his factual allegations as true, the Court lacks subject matter jurisdiction on the face of the petition.

The Court will deny the Motion to Dismiss after finding that Joshua has articulated facts and set forth legal claims sufficient to invoke this Court's jurisdiction.

The Court should next evaluate the merits of Joshua's four claims and resolve questions of law to determine whether Respondents may remove immigrants, like Joshua, who have received SIJ status.  To aid the Court in reaching the merits of Joshua's claims, the Parties shall jointly propose a briefing schedule to the Court no later than Friday, March 13, 2020.

The Court recognizes, however, that an order continuing an injunction becomes an immediately appealable interlocutory order.  28 U.S.C. § 1292(a)(1).  Should the Parties pursue an appeal, such an action would render a jointly proposed briefing schedule unnecessary.

**B.**     **Detention**

Either way, the record demonstrates that Joshua has been detained since February 2019. As discussed at the December 10, 2019 status hearing, the Court has concerns about Joshua's continued detention, particularly because he lacks any meaningful criminal history and has been granted SIJ status, which affords him significant benefits in accordance with a statutory scheme that Congress enacted for the protection of young immigrants.  *See* 8 U.S.C. § 1226(a) (permitting release of non-criminal aliens pending their removal proceedings).  At this juncture, case law does not appear to answer whether Joshua's ongoing detention comports with the Due Process Clause.  While *Zadvydas,* 533 U.S. 678, provides some guidance, it addressed a different question:  indefinite detention in the post-removal period.  *See also Jennings v. Rodriguez,* 138 S. Ct. 830 (2018) (discussing how long a noncitizen may be detained during removal proceedings); *Clark v. Martinez*, 543 U.S. 371, 386 (2005) ("Since the Government has suggested no reason why the period of time reasonably necessary to effect removal is longer for an inadmissible alien, the 6–month presumptive detention period we prescribed in *Zadvydas* applies"); *Pensamiento v. McDonald*, 315 F. Supp. 3d 684, 690 (D. Mass. 2018) (observing that "while the Supreme Court has held that § 1226(a) does not mandate that a clear and convincing evidence burden be placed on the government in bond hearings, it left open the question of whether the Due Process Clause does").

As a result of Joshua's ongoing detention, which has now exceeded one year, the Court will direct the parties to brief legal concerns arising from Joshua's detention, including whether

requiring an SIJ alien lacking meaningful criminal history to prove that he will not pose a danger to the community and will not present a flight risk violates the Due Process Clause. (*See* J. Stipulation R., ECF No. 40–1.)

### VIII.  Conclusion

For the reasons articulated above, the Court will deny the Motion to Dismiss. (ECF No. 20.)

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: Feb. 20, 2020
Richmond, Virginia